**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VENTURE GROUP ENTERPRISES, INC., | No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| VONAGE BUSINESS INC. F/K/A VONAGE BUSINESS LTD., | |
| Defendant. | |

Plaintiff Venture Group Enterprises, Inc. ("Venture"), by and through its undersigned

counsel, hereby files this Complaint against Vonage Business Inc. f/k/a Vonage Business Ltd.

("Vonage"), alleging as follows:

<u>**NATURE OF CASE**</u>

1.      This case concerns Vonage's bad faith breaches of its contractual obligations,

broken promises, and outright malicious intent to harm Venture.

2.      Venture is a company that focuses on creating highly scalable systems through

which telecommunications agents and carriers are able to conduct business more efficiently and

profitably than if they were to work directly with one another.  Venture contracted with Vonage,

a carrier best known for its Voice over Internet Protocol ("VoIP")-based communications

services, in 2015 with a mutual understanding of the parties' planned business model, as well as

the compensation structure and cooperation from Vonage needed to support it.

3.      Despite Venture's best efforts, Venture was not able to realize the benefits of its

agreements with Vonage due to Vonage repeatedly failing to live up to its commitments and

acting to harm Venture up through its wrongful termination of the parties' relationship in 2019

and beyond.  Vonage's conduct caused Venture millions of dollars in damages, which Venture

seeks to recover through this action.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

Complete diversity of citizenship exists between Venture, a North Carolina corporation

maintaining its principal place of business in North Carolina, and Vonage, a Delaware

corporation maintaining its principal place of business in New Jersey.  The amount in

controversy, exclusive of interest and costs, exceeds $75,000.

5.     This Court has personal jurisdiction over Vonage pursuant to the parties' written

agreement—a November 5, 2015 Vonage Business Channel Partner Agreement (the

"Agreement")—by which Vonage agreed that the Agreement is governed by New York law,

New York is the exclusive venue for the adjudication of all matters, and that Vonage submitted

to the jurisdiction of the appropriate or applicable courts of New York without any challenge to

venue.

6.     Venue in this Court is appropriate pursuant to 28 U.S.C. § 1391(b)(3) and the

parties' Agreement.

## BACKGROUND

**A.  Vonage's Business Model Before Affiliating with Venture**

7.     Prior to its affiliation with Venture, Vonage employed a sales model for its VoIP

services that faced significant scalability hurdles.

8.     Vonage's model made customers responsible for installing their own services.

Because few customers want to install their own services, for sales, Vonage largely relied on a

channel of agents that had installation capabilities in place to perform the installations for

customers to whom they sold Vonage's services.  Those agents with installation capabilities in

place, however, only represented a small percentage of the total agents that would otherwise be willing to sell Vonage's services.  Most agents would only sell services that are offered with a professionally managed installation service often offered by the provider of the telecommunications services.

9.     Vonage's model was also too inefficient to scale.  Vonage did not have an agent- or customer-facing ordering platform, accepted only credit cards as a payment form unless a special exception was made, and generally offered only electronic contracts (rather than, for example, paper contracts signed by an end user or a third-party verification system for committing to Vonage's offerings).  This model was not only inefficient for scaling volume, it also denied agents access to crucial information regarding the status of orders and required unnecessary effort from Vonage in the sales and onboarding process—especially Vonage's agent channel managers.

**B.  Venture's Business Model**

10.     Venture was formed in 1992 with a unique value proposition for both the third-party telecommunications agent selling carriers' offerings and the carrier community looking to sell its offerings.  Venture creates a collaborative environment allowing agents and carriers to do business together more efficiently and profitably than if they were to work directly with one another.  Venture focuses on creating highly scalable, automated back-end systems and associated processes to allow agents and carriers to more easily interact and allow agents greater opportunity to close sales.

11.     Venture's business model is designed to eliminate the need for agents to negotiate a contract with every carrier, produce enough business to reach a commitment level, or struggle with learning the carrier's products, processes, compensation plans, and related compensation

systems.  This enables agents to focus more on sales of network service and managed services, and less on back-end processes.

12.     Venture reduces the costs and challenges carriers face in providing support personnel and systems to run an agent channel.  Venture allows carriers to outsource to Venture some or all of the channel management and support functions.  Venture can provide the platform, personnel, and systems to help take on much of the agent support while interfacing seamlessly with internal teams so that both the agent and the carrier program operate in an optimal way.

13.     Through Venture's outsourced (fully or partially) model, carriers and agents benefit through accelerated revenue growth at lower cost.

14.     Venture seeks genuine long-term partnerships with both agents and carriers.  The sales and provisioning process, however, is by necessity a collaborative one between Venture and the carrier (in this case Vonage) and success depends upon each party adequately and faithfully performing its obligations and role in the process.  Particularly in the provisioning steps, Venture relies on carriers like Vonage to perform.

**C.  Venture Brings its Business Model to Vonage in Exchange for a Unique Compensation Model**

15.     In August 2015, Vonage met with Venture and asked it to become one of its sales partners.  After studying Vonage's then-current model for supporting its agent channel and onboarding customers, Venture proposed to Vonage an affiliation whereby Vonage could benefit from Venture's unique business model.  Venture explained its business model to Vonage and how, with Vonage's cooperation, Venture's proposed business plan would yield over $1,000,000 in customer orders per month within three years.  Venture's forecast was supported, in part, by its track record of prior success in similar relationships with other companies.

16.     Venture's proposed model would solve or minimize many, if not all, of the

4

challenges to growth inherent in Vonage's existing model and be far more scalable. It would exponentially increase revenue by providing professionally managed installations for customers, unlocking a new market of customers who would be interested in Vonage's services and more agents who would be willing to sell those services—which Vonage could also charge more for in the proposed, more sophisticated model. The proposed, partially-outsourced model would also reduce Vonage's costs by reducing its necessary involvement with installations and onboarding and allowing for greater transparency for all parties in the order and onboarding processes. In return, Vonage would agree to a contract structure and compensation plan with Venture different from other Vonage agents.

17.     By November 2015, Venture and Vonage had entered the Agreement and an addendum to the Agreement (the "Addendum"). The parties, from time to time, supplemented, modified, or otherwise gave meaning to the terms of the Agreement through formal and informal writings and conduct, including through the parties' courses of performance and dealing.

18.     Vonage's standard compensation plan ("SCP") for its partners, reflected in the Agreement, allowed Vonage to charge back 100% of commissions paid for a customer order: (1) if the customer's account terminated within 6 months of activating; or (2) if the customer did not pay Vonage. Vonage could issue the chargeback if the customer account was cancelled by Vonage within six months following activation due to nonpayment.

19.     From the outset of the parties' discussions, Venture explained to Vonage that its business model required a compensation plan materially different than Vonage's SCP.

20.     Venture advised Vonage that a key component of the business plan included creating large teams of transactional sellers and that these agents would not sell for either Venture or Vonage under Vonage's SCP allowing a 6-month chargeback window regardless of

5

fault.

21.     Venture told Vonage that agents would not accept the risk of selling services in a plan that would allow for chargebacks caused by Vonage's failure to perform or by any other forces outside of the agents' control.

22.     Vonage's SCP also presented too high of risks for Venture.  Just as Venture told Vonage that some of its agents would not be willing to perform under the SCP, Venture told Vonage it would not be willing to do so either.

23.     Venture explained to Vonage that it planned to advance commission payments to its agents weekly for their valid, submitted orders before the orders were completed or Venture had been paid by Vonage for the orders.  In essence, Venture was bearing the risk that orders would install at high rates and that chargebacks would not occur or, at least, not occur at a high rate.  Agents relied on Venture's payments to them, so that they could pay their individual representatives weekly, and many agents required a model with a higher upfront compensation component than Vonage's SCP.  Venture was not willing to front these payments to its agents, and the agents were not willing to perform, if Vonage could issue chargebacks for reasons outside of Venture's or its agents' control—and especially after 90 days from order submission to Vonage.  The entire business model depended on precluding, or substantially limiting, chargebacks.

24.     Accordingly, Venture and Vonage agreed to an alternative compensation plan ("ACP") in order to implement the business model, which is reflected in the Addendum.  Under the ACP, Venture was owed compensation for submitted customer orders once Vonage initially booked them.  Unlike the SCP's 6-month chargeback windows, which were triggered by account activation and for lack of payment, the ACP's chargeback windows were reduced to 90 days and

tied to an account's initial booking.  Specifically, the ACP permitted chargebacks only for:  (1) accounts that cancel prior to activation, (2) accounts that do not activate within 90 days of their initial booking, and (3) accounts that activate but terminate prior to 90 days after their initial booking.

25.     Additionally, and consistent with one of the ACP's purposes to minimize chargebacks and shorten the periods of uncertainty when chargebacks could be issued, the parties agreed that chargebacks could only be issued for a commission payment on the next scheduled commission payout following the month of the triggering event that allowed for the chargeback.

26.     In exchange for the ACP's unique upfront compensation model, the ACP provided for percentage rates of residual compensation lower than the rates in Vonage's SCP. Under the ACP, Venture was owed a monthly commission for the duration of each customer account from orders Venture submitted.  For each customer account, this residual monthly commission owed was a percentage of the customer account's monthly recurring net charges ("MRC"), with that percentage increasing after surpassing a certain level of MRC.

27.     In addition to the ACP commission, Vonage offered and agreed to pay Venture a differentiated compensation higher than the amount Vonage paid to any of its other agents.  This additional compensation was in recognition of the significant investment required by Venture and the corresponding benefit to Vonage.  In short, this differentiated compensation above what Vonage paid to other agents was in recognition that Venture provided a service unlike other agents.  To fulfill this promise, and in recognition of signification delays caused by obstructive elements within Vonage (*see* Part D), Vonage agreed verbally and by email to start paying Venture upfront compensation payments of 400% of MRC (the "400% MRC Payments") before the launch of the parties' program, which could be increased once Venture generated more than

$20,000 in new monthly revenue.  Vonage also represented that it would increase Venture's residual commission rate based on overall volume of business generated.  Venture relied on this promise and resulting payments in committing itself to its investment in the custom program with Vonage and incurring significant costs to further the parties' business model, which it would not have done but for this promise of receiving such a differentiated compensation. Venture expected to receive at least the promised 400% MRC Payments for the duration of its affiliation with Vonage and had agreed with Vonage that with significant success Venture would receive significantly more than this amount.

28.     The upfront compensation model was necessary to support the operation of Venture's business model.  Venture's profit was heavily tied to Venture retaining the residual compensation.  Venture's financial and reputational interests depended on submitted customer orders becoming long-lasting customer accounts.  Vonage's wrongful conduct, however, prevented Venture from realizing the benefit of the bargain it made with Vonage.

**D. Venture Builds Web-Based System Despite Resistance from Inside Vonage**

29.     When Venture and Vonage entered the Agreement and Addendum in November 2015, the parties agreed to implement the plan in principal with details to be ironed out later.

30.     Among the outstanding details were how to transmit customer orders into Vonage's system, coordinate facets of customer service, share order status, and coordinate the means by which these items would be implemented by Vonage's service delivery team ("Vonage Service Delivery").  These items needed to be addressed because, as noted, Vonage's existing business model did not rely heavily on coordinating installation and tracking orders.

31.     Venture built a web-based order management system to enable new sales channels and methods that Vonage would not otherwise have access to (the "Web-Based

System").  Through this system, for each order submitted by Venture's agents, Venture would

verify the order and contact the customer before submitting the order to Vonage Service Delivery

for Vonage to enter the order into its system.

32.     Venture explained to Vonage that it would create a recorded welcome-call

process, at Venture's own expense, to establish and record that customers wanted the services

and understood what they were purchasing before Venture submitted orders to Vonage.  This

welcome-call process allowed Venture to work with customers as they were onboarding.

33.     To facilitate this process, Venture created, and Vonage approved, proprietary new

paper agreements, verbal contracts, and Venture system-generated e-sign contracts for

customers.

34.     Vonage promised to, and did in fact, pay Venture approximately $50,000 to

supplement the cost of creating the Venture Web-Based System.  Vonage also promised to, and

did in fact, pay Venture an additional approximately $50,000 upon Venture submitting $20,000

worth of billing for customer accounts.

35.     While Vonage did make a financial contribution to Venture's efforts, parts of

Vonage were resistant to the new business model offered by Venture and failed to cooperate in

good faith with Venture to get the business model up and running, including through willful

delays by Vonage Service Delivery and Vonage's systems operations teams—which considered

Venture's business model a threat to render obsolete or reduce the importance of their operations

and personnel within Vonage.

36.     Vonage's bad faith conduct delayed the launch of the program for nine months

longer than would otherwise have been necessary.

37.     In light of the delays caused by Vonage and in recognition of its prior promise to

pay a differentiated compensation, Vonage began paying Venture the 400% MRC payments in November 2016 before the parties' launched their program.

38.     Finally, the program launched beginning in April-May 2017.

**E. Vonage Willfully Fails to Fulfill Its Minimal Obligations After Launch**

39.     Venture built the Web-Based System.  This system reduced Vonage's burden in the process of fulfilling orders for Vonage's offerings.  The Web-Based System also allowed transparency for both Vonage and agents to see the status of orders.

40.     Beginning at the launch of the program in April-May 2017, Venture vetted customer orders for completeness and accuracy, performed welcome calls with customers, learned customer needs, and scheduled technician visits for service installations on-site with customers.  Vonage had only to correctly enter orders, ship equipment, build customer accounts from information Venture provided, participate in the agreed-upon manner in an account setup call ("ASC") with each customer, and activate the customer accounts.  Vonage breached its contractual agreements with Venture by failing to do so in the manner it had promised, resulting in significantly higher customer cancellations than would have occurred had Vonage fulfilled its contractual obligations.

41.     ASCs were pre-scheduled calls with customers that Venture arranged in advance. The purpose of ASCs was to set up and train customers as well as activate their accounts. Vonage agreed to have personnel available for 2-hour windows to complete ASCs—with some customers requiring more than a 2-hour window, depending on the size of the customer. Vonage, however, failed to perform its obligations with respect to ASCs in the manner that had been agreed to.

42.     Time after time, customers and agents complained that Vonage never contacted

them for the ASC.  Even when Vonage did call for the ASCs, if customers did not answer
Vonage's first call—even if the customers called Vonage back shortly after being contacted—
Vonage told the customers their ASC window had passed and they had to reschedule the ASC,
even though their scheduled ASC time window had, in fact, not expired.

43.     Even when Vonage did participate in ASCs, it did so in an insufficient manner
and different from the process that had been agreed to, which required a more collaborative and
efficient process whereby customer accounts were adequately set up before ASCs so that there
was time during the ASCs to collaboratively discuss the benefits of the technology, customers'
businesses, and how best to set up the service to perform optimally for the customer.  Instead,
Vonage forced customers to set up much of the services in their web-based portal, did little more
than explain to customers how to pay their bills, and then activated customer accounts.  This
caused customers and agents to become dissatisfied and frustrated, resulting in customer
cancellations and agents deciding to stop selling for Venture.

44.     Although Vonage promised to maintain sufficient available personnel to conduct
timely ASCs, they did not do so.  After Vonage missed scheduled ASCs, it often took 10
business days to re-schedule the ASCs because Vonage lacked sufficient available personnel.

45.     Vonage Service Delivery insisted that it had recorded its ASCs with customers
but, when Venture asked to review the recordings, Vonage baulked—repeatedly citing incredible
technical difficulties.

46.     Unbeknownst to Venture or its customers, Vonage had also broken its promise to
never auto-activate customer accounts.  From the outset of Venture's discussions with Vonage,
Vonage promised that no customer account would be activated except through the ASC process.
In other words, Vonage promised that until the ASC had been completed, the account would not

be activated.  Without informing Venture or customers, however, in May 2017, Vonage Service Delivery set up in Vonage's system an automatic process whereby customer accounts would be automatically switched to active status 45 days after the initial booking of the account.  Once an account became active, it triggered Vonage's billing process.

47.     In addition to the improper chargebacks, the combination of Vonage's failures to participate in the ASC process in the agreed-upon manner and breach of its promise to never auto-activate customers, was an agent- and customer-relations disaster.  Because Vonage's frequent failures to participate in ASCs in the agreed-upon manner (if at all) or provide the adequate personnel it agreed to caused excess delays in originally scheduling ASCs and rescheduling ASCs, Vonage often prevented ASCs from being completed within 45 days of the initial bookings of customer accounts.  As a result, Vonage began billing customers who could not yet use their services because their ASCs—to adequately install the services—had been delayed.

48.     Because Vonage had delayed the ASCs, some customer accounts were activated and then terminated for non-payment without Venture or the customers even being aware of this. Other customers became furious upon learning that Vonage was billing them for services that they could not use—particularly because Vonage had delayed their ability to use the services. The debacle angered customers and frustrated agents.

49.     In response to the customer outrage, Venture sent Vonage Service Delivery a list of customers and asked for Vonage's urgent action in helping to salvage these customer relationships—including offering the customers credits.  Vonage Service Delivery took weeks to respond and ultimately offered some customers only minimal credits—all the while during Vonage Service Delivery's weeks-long delay more charges accrued on these customers'

accounts, which Vonage mostly refused to credit.  Vonage's failures caused massive

cancellations of otherwise viable customer accounts.

50.     Because of Vonage's failures, in October 2017, Venture began seeking to take

over certain responsibilities that Vonage Service Delivery was not fulfilling.  Vonage Service

Delivery unnecessarily and in bad faith delayed this transition for multiple weeks, including by

misrepresenting the preparation it needed to complete for the transition.  In mid-December 2017,

Venture ultimately took over many of these responsibilities that Vonage Service Delivery was

not fulfilling.  This is reflected in a December 18, 2017 amendment to the Agreement, which

obligated Vonage to collaborate in good faith with Venture and to provide Venture with any

training, guidelines, or directives that it wished Venture to comply with.  Vonage, in breach of its

obligations, never identified any such guideline or directive Vonage provided that it contends

Venture did not comply with when Venture was implementing services.

51.     Venture taking over these responsibilities was another unexpected and expensive

undertaking for Venture caused by Vonage's failures, including, for example, Venture having to

hire more numerous, skilled, and costly personnel than was anticipated at the start of its

affiliation with Vonage.  Accordingly, Vonage agreed to pay Venture an additional 100% MRC

for customer orders that were not charged back.  Fulfilling these additional responsibilities,

however, was not a condition to avoid chargebacks.  Moreover, the parties agreed that any

deficiency in Venture's provision of these services would not breach the Agreement.

52.     Once Venture took over certain responsibilities from Vonage, between December

2017 and May 2018, the issues Venture had experienced largely vanished and customer accounts

were successfully provisioned more efficiently and at a higher rate.  Complaints and

cancellations on new customer orders under this process were reduced to relatively low levels.

13

53.     Vonage Service Delivery, however, intentionally, and in bad faith, disparaged Venture, knowingly misrepresenting to Vonage's finance personnel ("Vonage Finance") that Venture caused the issues with customer activation and retention that led Venture to take over many of Vonage Service Delivery's responsibilities, which Vonage Service Delivery knew was false.  Vonage Service Delivery did this intentionally to damage Venture's reputation in the market and deprive it of its benefit of the bargain with Vonage.  Ultimately, Vonage Service Delivery's bad faith failure to implement the parties' program in the agreed-upon manner caused a high percentage of customers to cancel their services and resulted in increased costs because many more on-site technician visits were required than would have been if the program had been executed as planned.  Vonage Service Delivery intentionally misrepresented to Vonage Finance that Venture was responsible for these effects of Vonage Service Delivery's failures, which, combined with the high cancellation rates caused by Vonage Service Delivery's failures, induced Vonage to stop making the agreed-upon 400% MRC Payments that Venture had been relying on from November 2016 through December 2017.

F.  **Vonage Again Willfully Fails to Fulfill Its Minimal Obligations After Transitioning to ATA Installations**

54.     From the outset of the Venture-Vonage relationship, the parties planned to add to their ability to sell hosted voice services (which are VoIP services that include a hosted VoIP-enabled phone) the ability to sell the same service without a VoIP-enabled phone through sales made using analog telephone adapters ("ATA").  An ATA connects traditional analog telephones, fax machines, and similar devices to a VoIP network.  This requires connecting the customer's existing analog phone or equipment devices to the ATA's ports and performing necessary programming and cabling.

55.     ATA devices are only a fraction of the cost of a full VoIP-enabled phone and

14

accordingly would be much more lucrative for Vonage to offer.  Although Vonage had sold

ATAs to residential customers in the past, it was not offering ATAs as part of its standard

offering for business services when it became affiliated with Venture and thus was missing out

on a significant market.

56.    Venture got Vonage to test ATAs Vonage wished to use—in a process that took

Vonage 18 months to complete.  Vonage stated it had exhaustively tested the ATAs and the

installation processes that needed to be used, and that the product would work well for Venture's

customers and business plan.  In January 2018, Vonage advised Venture that ATAs were

approved.  Accordingly, planning for their launch through Venture's partners, as well as

implementation planning for deployment at customer locations, began.

57.    Vonage told Venture that, for ATA installations, only one ATA port would be

pre-provisioned and ready to be installed at customer sites, and the second port would need to be

provisioned and installed by a technician at customer sites.  Vonage told Venture that the only

way to accomplish this provisioning of the second port of an ATA for installation was in

conjunction with remote assistance from Vonage Service Delivery.

58.    Venture, concerned that Vonage Service Delivery would continue their failing

efforts, requested to be trained to complete the installations without relying on Vonage Service

Delivery.  Vonage Service Delivery refused this request.

59.    Venture informed Vonage that it had determined, through its own due diligence,

that many customers would need a connector switch to the internet modem to allow for an ATA

to be deployed at customer sites.  Vonage sourced a specific 8-port switch for this purpose.  At a

meeting in April 2019, Vonage's CEO and senior sales management promised Venture's CEO

that Vonage would provide such switches free of charge for any customer that needed one and

that it was fully behind this campaign and understood it would lead to greatly increased incremental sales at a higher profit to Vonage than sales of hosted services.

60.     Concerned that, based on prior experience, Vonage Service Delivery would not cooperate in good faith or do what it had promised it would do, Venture raised its concerns with Vonage's sales team ("Vonage Sales") and Vonage Service Delivery in May 2018.  Vonage Service Delivery assured Venture that it would fully support the ATA program, including by maintaining adequate personnel.  With Vonage's assurances and the promise of support at the highest levels of Vonage, Venture launched the ATA program in May 2018.

61.     Within the first month of the ATA program, Vonage failed its obligations.  Over the course of time, Vonage's failure to maintain sufficient personnel to assist on-site technicians with installations, which prevented technicians from completing their on-site installations, led to further backlog rescheduling installation appointments, and resulted in numerous costly rescheduled installations—including some installations that had to be rescheduled five or more times.

62.     ATA equipment ran out of stock, creating significant backlogs, despite Vonage's prior promises that this would not occur.

63.     Vonage also failed to ship the crucial 8-port switches some customers needed when they were requested.  Without telling Venture or Vonage Sales, Vonage Service Delivery involved Vonage Finance to approve the provisioning of the 8-port switches.  Vonage Service Delivery did this in bad faith knowing that the switch provisioning was already approved by Vonage's CEO and accordingly did not need to be presented to Vonage Finance because Vonage's CEO had authority to make this agreement without the requirement that Vonage Finance approve the provisioning of the 8-port switches.  Vonage Service Delivery intended to

again sabotage Venture's performance and damage its relationships with Vonage, customers, and other agents beyond even the scope of the Venture-Vonage affiliation.  Vonage Service Delivery delayed the shipping and implementation of the switches for up to six weeks by refusing to act until Vonage Finance had reviewed the financial model around providing the 8-port switches. Ultimately, Vonage Finance decided Vonage would only provide some customers the free switches Vonage had already agreed to provide.

64.    Vonage attempted to assess early termination fees against many customers that wanted to cancel their services after they experienced Vonage's failure to deliver what it promised to those customers.  Because Vonage was threatening these customers with early termination liability, Vonage was deterring the customers from providing payment at all.

65.    Vonage's failures caused unexpected increased costs to Venture, including, for example, higher personnel costs associated with delaying and rescheduling installations. Moreover, for many customers, once Vonage's failure to provide the 8-port switch equipment to customers became apparent, Venture was forced to pay out-of-pocket for the cost of the switch equipment and shipping in a good faith effort on its part to maintain the customers and mitigate damages.

66.    Vonage's series of failures caused delays that prevented installations for many customer accounts within 90 days of the account's initial booking and caused many customers who were fed up with Vonage's delays and broken promises to cancel and/or not pay for services.  Vonage Service Delivery, to further damage Venture's reputation and prevent it from enjoying the benefit of its bargain with Vonage, intentionally misrepresented to Vonage Finance that these issues caused by Vonage Service Delivery's deliberate sabotage of the ATA-based solution process were caused by Venture.  Vonage's conduct damaged Venture and its agents

through additional unanticipated costs, foregone compensation, and diminished relationships and reputation.

67.     In July 2018, Venture asked Vonage to abandon their scheduling software that was causing 10-day Vonage Service Delivery scheduling backlogs and instead use a larger team of personnel, who Vonage said would be available, in a technician call-in queue to facilitate ATA provisioning.  Vonage Service Delivery agreed to this change but again failed to follow through in the manner agreed upon, resulting in technicians being unable to reach Vonage when on site for customer installations.

68.     Although Vonage Service Delivery had promised Venture in May 2018 that it would provide necessary information about the ATA program to its customer service department ("Vonage Customer Service") to field calls from customers and prospective customers, it never did.  For example, rather than assist with on-site installation, when technicians and/or customers called into Vonage Customer Service, in many cases Vonage Customer Service told them such things as that Vonage did not have an installation program involving sending out technicians on-site, misrepresented to customers the functionality of ATAs and whether they could even support the voice services the customer purchased, wrongfully stated that Vonage did not provide ATAs, and even sometimes told on-site technicians they were not authorized by Vonage to be on-site and to leave.  Venture escalated these issues with Vonage repeatedly, but Vonage did not correct its ways.  In addition, when a customer would call in to cancel services Vonage failed to install, they were threatened with early termination liability.  This resulted in more customer complaints and cancellations, which were again blamed on Venture in bad faith by Vonage Finance and Vonage Service Delivery.

69.     Vonage's spreading of misinformation and preventing installations was

disastrous.  In October 2018, Venture set up a meeting with Vonage Service Delivery and other Vonage sales channel personnel.  At that meeting, Vonage Service Delivery denied that technician or customer calls were being fielded by Vonage Customer Service, but Venture demonstrated how it was happening due to the way Vonage Service Delivery had set up the technician call-in queue number and call flow process.  Vonage's head of retention confirmed many of Venture's complaints about Vonage's performance, including that Vonage Customer Service was not informed of the ATA program and as a result was giving incorrect information to customers, that customers were calling Vonage to cancel after Vonage's failures prevented on-site technicians from completing installations, and that customers were upset with the massive delays for installing services and the business disruption from multiple on-site technician visits—all of which were caused by Vonage's failures.

70.     After the October 2018 meeting, a Vonage manager proposed to Venture an equipment-based solution as a way to bypass Vonage Service Delivery.  Specifically, Vonage proposed sending customers one ATA per line to avoid having to program a second ATA port on the 2-port ATA solution Vonage was providing.  Venture advised that although this might help somewhat with new customers, it was not a good overall solution and left out all of the many hundreds of customers that had ordered services prior to offering this equipment-based solution. Venture again requested to perform the problem aspects of the installations itself.  This request, however, was again rejected and the equipment-based solution went into effect in November 2018 without solving the underlying issues in Vonage Service Delivery or Vonage Customer Service.

71.     For the first two weeks after this equipment-based solution was supposed to go into effect, Vonage Service Delivery manually changed customer orders to send only one ATA

per every two lines rather than the agreed-upon solution of one ATA per line.  Vonage Service

Delivery did this without telling Venture or Vonage Sales until Venture detected the misfeasance

and escalated the issue with Vonage.

72.     Once this equipment-based solution went into effect, Vonage Service Delivery—

unilaterally, without informing Venture or Vonage Sales—decided it no longer needed to

provide any call-in queue support for on-site technicians.  Vonage Service Delivery made this

undisclosed determination even though Vonage was receiving calls for support from Venture and

on-site technicians.

73.     As Venture had warned Vonage, the equipment-based solution was of no use to

customers who were sold services before the solution was implemented in November 2018.

Even for many customer orders placed after the equipment-based solution was implemented, the

on-site technicians needed Vonage's support to complete the installation.  Because Vonage

Service Delivery had secretly decided to pull essentially all of its support, however, the on-site

technicians' calls to Vonage for assistance were often futile.  On-site technicians for ATA orders

who could not reach Vonage would often have to undo their work and abort the installations.

This led to more delays in completing on-site installations, resulting in order cancelations by

angered customers and frustrated technicians turning down on-site installation jobs because they

knew the installations were unlikely to be successful and they would face upset customers.

74.     Meanwhile, Vonage Service Delivery continued to act in bad faith to prevent

Venture from realizing the benefit of its bargain with Vonage.  For example, after the October

2018 meeting between Venture and Vonage, a Vonage direct sales manager told Venture that

Vonage Service Delivery had prevented her sales team from teaming up with Venture by

threatening not to provide anywhere close to the same level of support for her team's customer

accounts as the support it would provide if her team agreed not to partner with Venture on its

sales program.  Vonage Service Delivery did not have a legitimate business reason to do this;

rather, it only intended to harm Venture and divert its business to Vonage's standard program

with agents other than Venture or otherwise deprive Venture of opportunities.

75.     In light of the issues caused by Vonage and its long-standing promise to provide

Venture a differentiated compensation that was higher than it provided other agents (and that

Vonage breached when it stopped making the 400% MRC Payments after December 2017), in

October 2018, Vonage agreed to pay Venture an additional 200% of MRC (the "200% MRC

Payments").  Without Vonage's agreement to pay this additional compensation, Venture would

not have continued obtaining orders for Vonage.  Venture relied detrimentally on its agreement

with Vonage for Vonage to pay this additional compensation—but Vonage never made the 200%

MRC Payments.

76.     By January 2019, contrary to Vonage's obligations, Vonage Customer Service

stopped providing the support it was supposed to provide to installed customers and instead

began "blind" transferring customer calls to Venture.  When customers called Vonage with

almost any service issue, Vonage would simply transfer the calls to Venture personnel without

warning.  These blind transfers breached Vonage's duties and further burdened Venture, which

was already dealing with the fallout with customers and agents caused by Vonage's failure to

support installations or deliver to customers what it promised.

77.     Vonage Customer Service, up until very near the end of the Venture-Vonage

relationship, refused to directly discuss with Venture providing correct information on Venture's

process and the parties' ATA sales program to its team and returning to the agreed-to process for

directing customers to Venture, which was only for customers that had not completed the

21

installation process.  Vonage Sales attempted to get this process changed back to what it had been and get corrected information to Customer Service but was unable to obtain cooperation for Vonage Customer Service to adhere to what had been agreed upon.

78.     Vonage's failures ultimately caused agents to stop selling for Venture and Venture to suffer huge losses from cancellations and the costs associated with attempting to remedy Vonage's breaching conduct.

**G.  Vonage Begins Wrongfully Issuing Chargebacks**

79.     In light of the significant investment required by Venture, the parties contracted for the limited chargeback availability detailed in the parties' agreement restricting Vonage from issuing chargebacks other than for compensation paid to Venture for (1) accounts that cancel prior to activation, (2) accounts that do not activate within 90 days of their initial booking, and (3) accounts that activate but terminate prior to 90 days after their initial booking.  If a customer account activated within 90 days of its initial booking and did not cancel within 90 days of its initial booking, Vonage could not issue chargebacks for compensation paid to Venture for that account.

80.     Even for customer accounts that did not activate within 90 days of their initial booking, Vonage—from the outset—repeatedly accepted Venture's performance, acknowledged the delays were not Venture's fault, and did not issue chargebacks for compensation paid to Venture for those accounts.

81.     Despite promising that customer accounts would never be activated until the customer was prepared to use the services, Vonage maintained a feature in its systems that auto-activated customer accounts after a pre-set time from their initial booking.  Venture asked Vonage to ensure that this activation feature would not apply to customers associated with

Venture—as the parties had agreed—but Vonage refused despite being able to do so.  After

December 2017, Venture was able to manually override Vonage's auto-activation feature and did

so for customer accounts that were experiencing issues beyond Vonage's auto-activation date

due to Vonage's failures.  Vonage was aware of this practice and did not issue chargebacks for

compensation paid for such customer accounts that did not activate within 90 days of their initial

booking.  For example, when a large number of customer accounts were not activated within 90

days of order acceptance due to failures by Vonage Service Delivery in 2018, Vonage did not

issue chargebacks for those accounts.  But for this established course of dealing, Venture would

not have overridden Vonage's auto-activation date further than 90 days from order acceptance.

Venture's reliance was reasonable, foreseeable, substantial, to its detriment, and only explained

by Vonage's assurances, the parties' course of dealing, and contract terms requiring a

chargeback to be issued in the month following the event that would give rise to the chargeback.

82.     Vonage Sales acknowledged that Vonage Service Delivery's conduct—not

Venture's—caused certain customer accounts not to activate within 90 days of initial booking.

83.     In late February 2019, Vonage began wrongfully issuing significant chargebacks

for compensation paid for customer accounts that activated within 90 days of their initial

booking and did not cancel within 90 days of their initial booking.

84.     Also in late February 2019, Vonage told Venture that it would begin issuing

chargebacks for compensation paid for customer accounts that did not activate within 90 days of

their initial booking.  Vonage also told Venture to activate certain customer accounts by the

arbitrary date of March 15, 2019, or Vonage would issue chargebacks for commissions paid on

those accounts.

85.     Venture protested that this abrupt policy change violated the parties' agreement

and years of dealing.  It also warned that there was insufficient time to adapt to the change and complete customer installations, particularly in light of Vonage hindering the installations. Vonage disregarded Venture's concerns.

86.     Venture followed Vonage's directives to ensure the customer accounts activated within 90 days or by March 15, 2019.  The parties had agreed that customers with activated but not fully installed accounts would be directed to Venture to complete installation.  Vonage, however, withheld from Venture calls from some or all of these customers, disparaged Venture when communicating with the customers, and prevented Venture from remedying the consequences of Vonage's bad faith conduct.  In fact, while Vonage was blind transferring other customers to Venture, it was withholding from Venture calls from these recently activated customers.  Venture was using its best efforts to save the parties' program despite Vonage's bad faith directives; Vonage was trying to destroy the program and Venture's reputation.

87.     Compounding the injury, Vonage proceeded to issue chargebacks for commissions paid on these customer accounts that were activated at Vonage's behest.  These customer accounts were activated within the timeframe Vonage represented would not result in chargebacks.  Vonage also wrongfully issued chargebacks beyond the next scheduled payout from the purported triggering events for the chargebacks.

**H.  Vonage Removes the Control and Compensation Venture Bargained For**

88.     In May 2019, Vonage told Venture that it intended, after a 30-day period, to cancel the unique aspects of its affiliation with Venture that were not part of Vonage's standard partnership terms with other parties and formed the basis for Venture affiliating with Vonage to begin with.  The unique compensation model and Venture's order processing system were among the aspects Vonage planned to cancel.  Even though Venture objected to this action by

Vonage, its protests were ignored. Venture advised Vonage that Vonage Service Delivery would interfere with the customer-onboarding process during this 30-day period, and, for those customers whose service had not been installed at the end of the 30-day period, abandon any attempts to fulfill the promised professional installation that those customers had signed up for. Venture asked that it be allowed to continue processing those customer orders submitted or still in the onboarding process during the 30-day window.  Vonage disregarded Venture's concerns.

89.     During the 30-day period, Vonage Service Delivery repeatedly sought to take over all aspects of the onboarding process Venture was handling and grew increasingly uncooperative and threatening in their conduct.  Vonage Service Delivery would no longer even provide Venture the status of customer accounts or cooperate with Venture on basic aspects of installation that had never been a problem before.

90.     Although Vonage promised not to interfere with scheduled customer on-site installations, on the day after the 30-day period expired, Vonage Service Delivery contacted the technician company it was contracted with and demanded that they cancel any scheduled installations and abandon any installations in progress—even those installations in process that day.  When Venture raised this issue with Vonage, Venture was ignored.

91.     As Venture warned Vonage, after the 30-day transition period, Vonage Service Delivery failed its obligations by not onboarding customers for orders Venture submitted and not rescheduling on-site technician visits for most customer orders.  Vonage Service Delivery also maliciously refused to provide Venture basic information on the status of customer orders Venture submitted or otherwise cooperate with Venture, damaging Venture's relationships with its agents.  Vonage Service Delivery insisted that it would only provide information directly to agents that contact Vonage Service Delivery.  Vonage Service Delivery did this intentionally to

freeze out Venture, deprive Venture the benefit of its bargain with Vonage, damage Venture's

relationships with its agents and reputation in the market, and cost Venture future business.

    **I.   Vonage Continues Wrongfully Issuing Chargebacks and Improperly Terminates the Agreement**

        92.    Vonage wrongfully issued massive chargebacks in March 2019.  Among other

reasons, many chargebacks were wrongful because they were issued beyond the next scheduled

payout from the purported triggering events for the chargebacks.  After Venture disputed these

and other chargebacks, Vonage purported to terminate the Agreement for convenience in June

2019 and wrongfully demanded that Venture cease selling Vonage's services immediately,

despite the Agreement's non-renewal from the termination not occurring until November 2019.

After it was clear that Venture would not accept the chargebacks that were being made, Vonage

then wrongfully terminated the Agreement for cause in August 2019 with the intent of avoiding

making commission payments to Venture.

        93.    Not only was there no basis for Vonage to terminate the Agreement for cause but,

as set forth herein, Vonage's intentional and/or otherwise grossly negligent conduct in reckless

disregard for Venture's rights impeded the success of the parties' relationship.  Indeed, Vonage

had not satisfied the material obligations it owed to Venture under the Agreement and otherwise

acted in bad faith outside the scope of the Agreement to harm Venture.

        94.    Vonage also failed to follow the dispute resolution procedure, or provide the

opportunity to cure, that Venture contracted for.

        95.    The Agreement outlines the process for resolving disputes arising under the

Agreement.  It provides for a step-by-step escalation process among Vonage and Venture

personnel before the parties may pursue other remedies under the Agreement.  Vonage did not

adhere to the dispute resolution process mandated by the Agreement before wrongfully

terminating the Agreement.

96.     The Agreement provides that it automatically renews annually unless the terminating party provides the non-terminating party written notice of termination not less than ninety days prior to the expiration of the current annual term.  The Agreement could only otherwise be terminated for cause for certain breaching conduct—none of which Venture engaged in.  The Agreement prohibits Vonage from terminating the Agreement for cause without first providing Venture written notice and a 30-day period to cure.  Vonage did not provide this notice and opportunity to cure.

97.     Even after wrongfully terminating the Agreement for cause, Vonage continues to issue improper chargebacks.

**COUNT I**
**(BREACH OF CONTRACT)**

98.     Venture incorporates by reference the allegations in all of the foregoing paragraphs of this Complaint as if fully set forth herein.

99.     The Agreement, as amended, supplemented, and interpreted as evidenced by the parties' conduct is a valid, binding, and enforceable contract between Venture and Vonage.

100.     Venture satisfied in all material respects the obligations it owed to Vonage under the Agreement.

101.     Through its wrongful conduct, as alleged above, Vonage breached its contractual obligations to Venture.

102.     Vonage's refusal to continue making the 400% MRC Payments constitutes a breach of the Agreement.

103.     Vonage's failure to provide adequate support to Venture, agents, or customers constitutes a breach of the Agreement.

104.     Vonage's failure to make the 200% MRC Payments constitutes a breach of the Agreement.

105.     Vonage's failure to provide Venture sufficient training, guidelines, and directives constitutes a breach of the Agreement.

106.     Vonage's failure to collaborate with Venture in good faith to optimize the provision of services constitutes a breach of the Agreement.

107.     Vonage's failure to pay Venture compensation owed for customer orders constitutes a breach of the Agreement.

108.     Vonage withholding from Venture the information that customers Vonage demanded to be activated by March 15, 2019 called Vonage with complaints constitutes a breach of the Agreement.

109.     Vonage failing to collaborate with Venture to respond to customers Vonage demanded to be activated by March 15, 2019 who called Vonage constitutes a breach of the Agreement.

110.     Vonage's wrongful issuance of chargebacks constitutes a breach of the Agreement.

111.     Vonage's failure to adhere to the requisite dispute resolution process constitutes a breach of the Agreement.

112.     Vonage's failure to offer Venture an opportunity to cure constitutes a breach of the Agreement.

113.     Vonage's wrongful termination of the Agreement constitutes a breach of the Agreement.

114.     Vonage's breaching conduct was intentional or otherwise grossly negligent and in

reckless disregard for Venture's rights.

115.    Venture has been damaged as a direct result of Vonage's breaching conduct and is entitled to damages in an amount to be determined but not less than $10,000,000.

**COUNT II**
**(BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)**

116.    Venture incorporates by reference the allegations in all of the foregoing paragraphs of this Complaint as if fully set forth herein.

117.    The Agreement includes a covenant of good faith and fair dealing.

118.    Through Vonage's conduct alleged herein, even if it was not governed by or in breach of an express term of the Agreement, Vonage breached the covenant of good faith and fair dealing implied in the Agreement.

119.    Vonage Service Delivery changing customer orders to send only one ATA per every two lines rather than the agreed-upon solution of one ATA per line without telling Venture or Vonage Sales breached the implied covenant of good faith and fair dealing.

120.    Vonage surreptitiously working in bad faith behind Venture's back to subvert the Agreement and blame Venture without basis breached the implied covenant of good faith and fair dealing.

121.    Vonage acting in bad faith to damage Venture's reputation in the market breached the implied covenant of good faith and fair dealing.

122.    Vonage acting in bad faith to damage Venture's relationships with agents, technicians, and customers breached the implied covenant of good faith and fair dealing.

123.    Vonage acting in bad faith to cost Venture business with other parties breached the implied covenant of good faith and fair dealing.

124.    Vonage acting in bad faith to cost Venture future business breached the implied

29

covenant of good faith and fair dealing.

125.    Vonage acting in bad faith to usurp Venture's relationships with agents breached the implied covenant of good faith and fair dealing.

126.    Vonage acting in bad faith to prevent Vonage's direct sales managers and sales representatives from teaming up with Venture breached the implied covenant of good faith and fair dealing.

127.    Vonage threatening to issue chargebacks for commission payments beyond the next scheduled commission payout following the purported triggering events for the chargebacks breached the implied covenant of good faith and fair dealing.

128.    Vonage arbitrarily setting a deadline of March 15, 2019 to activate customer accounts and then secretly disparaging Venture to those customers breached the implied covenant of good faith and fair dealing.

129.    Vonage's breaching conduct was intentional or otherwise grossly negligent and in reckless disregard for Venture's rights.

130.    Venture has been damaged as a direct result of Vonage's breaching conduct and is entitled to damages in an amount to be determined but not less than $10,000,000.

## COUNT III
### (PROMISSORY ESTOPPEL)

131.    Venture incorporates by reference the allegations in all of the foregoing paragraphs of this Complaint as if fully set forth herein.

132.    Vonage made clear and unambiguous promises to Venture, including to continue making the 400% MRC Payments or at a minimum to make the 200% MRC Payments, and to not issue chargebacks for compensation paid for customer accounts on which Venture had to override Vonage's auto-activation feature such that the accounts did not activate within 90 days

of their initial booking.

133.    Venture reasonably and foreseeably relied on Vonage's clear and unambiguous promises to its detriment, causing harm to Venture.

134.    If Vonage's clear and unambiguous promises are deemed outside the scope of any contract or within the scope of an unenforceable contract, they are enforceable through promissory estoppel.

135.    Venture has been damaged as a direct result of Vonage's conduct and is entitled to damages in an amount to be determined but not less than $10,000,000.

## COUNT IV
## (QUASI CONTRACT)

136.    Venture incorporates by reference the allegations in all of the foregoing paragraphs of this Complaint as if fully set forth herein.

137.    Vonage's conduct caused Venture to perform services in good faith additional to those that Venture reasonably expected to perform when entering the Agreement.

138.    Vonage accepted these services.

139.    Venture reasonably expected compensation for these services.

140.    Through these services, Vonage was enriched at Venture's expense such that equity and good conscience militate against permitting Vonage to retain the value of the services Venture seeks to recover.

141.    To the extent these services are deemed to have been performed outside the scope of a valid contract, Venture is entitled in quantum meruit to the reasonable value of these services, including, for example, the unpaid 400% MRC Payments or at a minimum the 200% MRC Payments.

142.    Venture has been damaged as a direct result of Vonage's conduct and is entitled

to damages in an amount to be determined but not less than $10,000,000.

## PRAYER FOR RELIEF

WHEREFORE, Venture hereby demands the following relief against Vonage:

(a) Damages in an amount to be proved, but not less than $10,000,000;

(b) Other consequential damages;

(c) Attorneys' fees and costs;

(d) Pre-judgment and post-judgment interest; and

(e) Any other relief that this Court deems just and proper.

Dated: May 28, 2020                           KELLEY DRYE & WARREN LLP

                                       By:    /s/  Joseph A. Boyle
                                              Joseph A. Boyle
                                              Robert N. Ward
                                              101 Park Avenue
                                              New York, NY 10178
                                              Tel: (212) 808-7800
                                              Fax: (212) 808-7897
                                              jboyle@kelleydrye.com
                                              rward@kelleydrye.com

                                              *Attorneys for Venture Group
                                              Enterprises, Inc.*