USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VENTURE GROUP ENTERPRISES, INC.,

                        Plaintiff,

          -v-

VONAGE BUSINESS INC. f/k/a VONAGE
BUSINESS LTD.,

                        Defendant.

---

No. 20-CV-4095 (RA) (OTW)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Venture Group Enterprises, Inc. ("Venture") brings this action against Defendant Vonage Business Inc. ("Vonage") for breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppel, and quasi-contract. The dispute centers on a Channel Partner Agreement for Venture to sell Vonage's voice over internet protocol ("VOIP") services, and the subsequent breakdown of the business relationship between the parties. Now pending before the Court is Vonage's motion for summary judgment. For the reasons that follow, the motion is granted.

## BACKGROUND

### I. The Channel Partner Agreement

The following facts are undisputed unless otherwise noted.[1] Vonage is a cloud-based

---

[1] Venture purports to contest many of the paragraphs in Vonage's Rule 56.1 Statement of Facts, but fails to "specifically controvert" Vonage's statements as required by Local Civil Rule 56.1(c). *See Wells Fargo Bank, N.A. v. Bivona & Cohen, P.C.*, 2016 WL 2745847, at *1 n.2 (S.D.N.Y. May 11, 2016). Consistent with the Local Rule, the Court thus deems Vonage's statement to be admitted in such instances. *See* Local Civil Rule 56.1(c); *see also Russell v. Aid to Developmentally Disabled, Inc.*, 753 F. App'x 9, 12-13 (2d Cir. 2018) (holding that "the district court did not abuse its discretion in requiring compliance with [Local Rule 56.1] and crediting as undisputed those facts that [the non-moving party] did not properly controvert in her opposition").

communications provider that offers VOIP phone and internet services.  The company largely outsources its sales function to independent contractors through its Channel Partner Program. On November 5, 2015, Vonage entered into one such Channel Partner Agreement (the "CPA") with Venture, pursuant to which Venture would sell Vonage's VOIP services through a network of sub-agents.  Vonage Rule 56.1 Statement of Facts ¶¶ 4, 6.

Pursuant to the CPA, Venture was expected to "own the end-to-end sales process" and "[s]ell the Company Services to customers without substantial involvement of [Vonage] staff." CPA § 1.1.  Payment under the CPA was commission-based.  For each customer contract that Venture obtained and Vonage accepted, Venture was paid a monthly residual commission for the life of that customer contract, calculated in accordance with Appendix A of the CPA.  *Id.* § 3.1; *see id.* App'x A § 1.3.  Vonage was entitled to charge back overpayments within 120 days if they were made under the following circumstances: (1) The account canceled prior to activation, (2) the account did not activate within ninety days of the initial booking, or (3) the account activated but terminated within ninety days of the initial booking.  Addendum to App'x A § 9(b), Fioccola Decl., Ex. 53; *see also* CPA § 3.1. If Venture believed a "mistake in the calculation of compensation" occurred, it had ninety days from receipt of the purportedly mistaken payment to notify Vonage, otherwise it "waive[d] any right to object to or reject that calculation or to claim any breach of [the CPA] by [the] Company based on that calculation."  CPA § 3.4.

The CPA authorized Venture to hire sub-agents, but made Venture "accountable and liable for all Sub-Agent acts, omissions and non-compliances with the terms of this Agreement, to the same extent [Venture is] so accountable and liable."  *Id.* § 1.1.  As relevant to this motion, Section 2.5 of the CPA required Venture and its sub-agents to "truthfully and correctly communicate the availability, features, rates, and related information regarding the Company

Services." *Id.* § 2.5.   Similarly, Section 2.10 prohibited Venture and its sub-agents from "knowingly mak[ing] any false statement, misrepresentation, negative comment, half-truth or unrealistic promise or commitment about Company Services, a Customer Contract, or [the] Company to anyone." *Id.* § 2.10.

Section 8 of the CPA governed renewal and termination.   Under Section 8.1, after an initial term of thirty-six months, the Agreement would automatically renew for additional one-year terms "unless written notice of termination is provided by the terminating party to the non-terminating party not less than ninety (90) days prior to the expiration of the Initial Term or the then-current Renewal Term, as applicable." *Id.* § 8.1.   Section 8.2.1—the central provision at issue in this case—specified grounds on which the CPA could be terminated:

> 8.2.1 [Vonage] may terminate this Agreement . . . and any further compensation hereunder, upon your failure to cure within the 30 day cure period described above, if you:
> > (1) Have intentionally or recklessly made any materially false representation, report or claim in connection with the sale of Company Services; or
> > (2) Engage in any unlawful or fraudulent activity in connection with the sale of Company Services.
>
> Notwithstanding the foregoing or any other term of this Agreement, if a Sub-Agent of yours is responsible for the violations described in this Section 8.2.1, you will have the opportunity to effect the cure described in this section within thirty (30) days of your receipt of Vonage Business' termination notice if each of the following is true: (i) N/A[;] (ii) you have not otherwise been negligent in your oversight or management of the Sub-Agent; (iii) you have not knowingly permitted or allowed such violations; (iv) you took appropriate and prompt means to terminate and further prevent such violations upon becoming aware of such violations.

*Id.*   In the event the CPA was terminated pursuant to Section 8.2.1, Vonage could cease to pay Venture's commissions, as Section 3.2 stated: "Unless this Agreement is terminated by [the] Company pursuant to Section 8.2.1, [the] Company shall continue to pay you Commissions after termination of this Agreement for Customers procured by you for as long as such Customers continue to utilize the Services . . . ." *Id.* § 3.2. Vonage was also permitted to charge back

overpayments at any time if they were "attributed to a violation of Section 8.2 by [Venture] of a Sub-Agent." *Id.* § 3.1.

## II. Sub-Agent Misrepresentations

At some point during the life of the CPA, Venture's sub-agents began using misrepresentations to make sales to consumers, which led to numerous cancellation requests of Vonage's services. The earliest evidence in the record of such misrepresentations is from August 2017. On August 11, 2017, Thomas Greene, the Vice President of Sales and Operations at Venture, emailed several representatives at Telecom Group, Inc. ("Telecom"), one of Venture's sub-agents, noting "2 complaints in the last week of customers saying they were told that Vonage purchased Spectrum and they need to switch their services," an assertion that was false. Fioccola Decl., Ex. 10. He asked Telecom to "investigate ASAP as to who the sales rep was and what you are going to do to address this issue going forward." *Id.* Mr. Greene followed up with another email on August 14, stating "[h]ere are 2 more… this is now a HUGE problem. Call me ASAP!" *Id.*

Unfortunately for both Venture and Vonage, the misrepresentations persisted. The following email communications, which are non-exhaustive, reflect further examples of sub-agent misrepresentations that continued through 2019:

- On July 20, 2018, Aly Johnson, a Venture project manager who worked on the Vonage account, sent an email to Jennifer Greene, Venture's Director of Operations, which read: "Keegan had a call with this customer today [who] expressed extreme concern because the agent stated that 'optimum would be going out of business in their area and they had no choice but to switch to Vonage. . . . The customer had a visit from Optimum today and was told that this was not the case, that the customer was lied to. The customer is now very upset with being misl[ed] on the process . . . I feel like this could potentially be bad." Fioccola Decl., Ex. 11.

- On July 26, 2018, Ms. Greene sent an email to Telecom noting a customer had recently canceled his Vonage service because "he agreed to sign up under the guise that Vonage purchased Spectrum . . . when he called Spectrum, [they] informed him that they were

not purchased by [Vonage]."  Fioccola Decl., Ex. 13.

- On August 24, 2018, Ms. Greene sent an email to Telecom which read: "Customers are stating they were told that Spectrum and Vonage were merging / buying each other out. Customers are . . . [u]nder the assumption they don't have a choice to switch – which is inaccurate and misleading."  Fioccola Decl., Ex. 14.

- On October 4, 2018, Johnson sent an email to Jennifer and Thomas Greene noting that a customer requested to cancel his Vonage services "because he was told that Vonage bought out Charter and they would no longer be providing services in the area, so he had to switch.  Customer does not wish to speak to sales again about this and feels as though he has been lied to."  Fioccola Decl., Ex. 15.

- On November 6, 2018, Johnson emailed a Telecom representative noting that a customer was told "she has no choice but to go with Vonage because her voice services would no longer be provided by Spectrum."  Fioccola Decl., Ex. 16.

- On February 6, 2019, Ms. Greene emailed Telecom reporting a customer complaint and noting, "The customer stated he was misled, he was told that 'Vonage is taking over Spectrum services.'"  Fioccola Decl., Ex. 17.

- On March 19, 2019, Tatyana Anderson, an account coordinator at Venture, emailed Jennifer and Thomas Greene reporting a cancellation request and noting that the customer "stated sales agent told her Comcast and Venture w[ere] merging."  Fioccola Decl., Ex. 19.

- On April 4, 2019, Doug Turpin, Venture's Chief Executive Officer, emailed other Venture representatives stating, "[Vonage] did have a significant percentage of customers cancel due to what appears to be pretty clear misrep issues.  This was the cancel reason we got on 15-20% of their customers after we had paid them for the order on submitted from info from Vonage or our calls to customers.  It also influenced the poor install rate on the initial orders."  Fioccola Decl., Ex. 20.

There is also evidence in the record that, at least throughout 2017 and 2018, Venture instructed its employees to hide the extent of the sub-agent misrepresentations from Vonage.  For example, on September 6, 2017, Ms. Greene sent an email to two Venture agents, copying Johnson, that read: "Please delete the following note on this order . . . Customer is upset because they claim that they have been misled and lied to on numerous occasions."  Fioccola Decl., Ex. 34.  Ms. Greene added: "We do not want Vonage to see this note."  *Id.*  On August 10, 2018, nearly a year later, Ms. Greene again told Johnson that "cancellation reasons may need to be

sanitized before sending to [Vonage]." Fioccola Decl., Ex. 35. She emphasized that "[w]e should NOT be telling Vonage" a customer canceled her services because she "felt like she was lied t[o]" by the sales agent. *Id.*

On November 9, 2018, Miosha Cross, a Venture employee, emailed Jessie Tallant, a Service Delivery Manager at Vonage, reporting a customer had canceled his service "because the sales agent lied to him and stated that [V]onage bought out [C]harter." Fioccola Decl., Ex. 36. Johnson then emailed Cross separately, stating: "We really want to make sure we sanitize these before we send them to Vonage. We should never tell Vonage that a customer cancelled because the agent lied to them, even if that is the reason. That only makes us look bad, and may get us into trouble." *Id.* Finally, on November 19, 2018, Ms. Greene emailed Johnson and another Venture representative reiterating, "Please let everyone know that cancel emails should be reviewed by a mgr with the 'reason' being checked to make sure it is sanitized." Fioccola Decl., Ex. 37.

### III. Vonage's Investigation and Termination of the CPA

On February 28, 2019, John Reid, the Regional Channel Manager at Vonage, sent Doug Turpin a "claw back list" of 125 accounts that had not been properly activated and thus did not qualify as valid sales. Fioccola Decl., Ex. 38; *see also id.*, Ex. 39. According to Vonage, Venture "suspiciously activated" these 125 accounts—an assertion that Venture disputes—by simply switching the status to "active" without actually completing the activation process, including by obtaining valid credit card information. Vonage Rule 56.1 Statement of Facts ¶¶ 68, 72; *see* Venture Response to Vonage Rule 56.1 Statement of Facts ¶¶ 68, 72. On March 28, 2019, Vonage's fraud department initiated an investigation into Venture's sales practices, including these "alleged auto-activated charge backs," by attempting to contact and interview the

account holders of the 125 auto-activated accounts (the "Fraud Department Investigation"). Haniff Deposition Tr. 187:13-24; *see also* Fioccola Decl., Ex. 41; Fioccola Supp. Decl., Ex. 61.

On June 11, 2019, while the Fraud Department Investigation was ongoing, Vonage sent Venture a letter stating that it would not renew the CPA for an additional year upon the CPA's expiration on November 3, 2019 (the "June Letter"). The June Letter did not specifically cite sub-agent misrepresentations, instead referring more generally to "the past and current dynamics of the relationship, including the chargeback, operational and transition disputes, and Venture Group's conduct." Fioccola Decl., Ex. 43, at 1. The June Letter did mention the Fraud Department Investigation and alluded to possible breaches of the CPA, stating:

> March Activations. Venture Group's actions in March 2019 were recently brought to Vonage's Legal Department's attention and are now under current investigation by Vonage. In March 2019, Venture Group unilaterally activated several accounts in direct response to a significant amount of chargebacks being properly assessed by Vonage. Upon Vonage's further investigation, it has revealed material issues which on their face, rise to the level of contract violations and prohibited conduct. This has caused a need for additional transactional reviews, which may further suggest additional issues for resolution or the exercise of additional remedies.

*Id.* In terms of next steps, the June Letter stated: "Without either party waiving its rights and remedies, and without disregarding the importance of key issues, Vonage believes that the parties' immediate focus should be on transitioning the Additional Services under the Transactional Program," and further advised Venture to "discontinue all sales activity of Vonage products and services." *Id.* at 1-2.

The Fraud Department Investigation concluded on July 11, 2019, after Vonage attempted contact with 100 of the 125 account holders. Fioccola Supp. Decl., Ex. 64. In an internal email to Vonage management, William Lornegan, a Fraud Manager at Vonage who led the investigation, reported "[s]ome high-level takeaways" as follows: "The people that were contacted were mostly very unhappy with the experience. . . . An attempt at installation, which

7

was unsuccessful because of lack of follow-through by the installers . . . No contact at all by the installer . . . Did not recall signing up with Vonage . . . Could not get the service to work because of some basic incompatibility." *Id.* Lornegan also attached to the email "the comments from the Associate that interviewed the customers, as well as relevant comments pulled from cases related to Collections or Care calls." *Id.* In those case comments, a handful of accounts referenced misrepresentations made during the sale of Vonage services—a fact that Venture expressly concedes. *See* Fioccola Supp. Decl., Ex. 65; Venture Rule 56.1 Statement of Facts ¶ 267 ("For 125 accounts examined by Lornegan in July 2019, less than five mentioned Vonage taking over another, or merging with, another carrier.").

On August 2, 2019, Vonage sent Venture a letter "terminat[ing] the Agreement for cause pursuant to Section 8 of the Agreement" (the "August Letter"). Fioccola Decl., Ex. 51, at 1. The August Letter detailed Vonage's grievances with respect to improperly activated accounts and disputed chargebacks, stating in part:

> Our review of the disputed cancelled accounts . . . indicated an ongoing, clear pattern of Venture Group allowing account system auto-activations (defaulting to the 45th day after booking) prior to completion of the service delivery process which consistently result in misdirected billings, uncollectible accounts and auto-cancellations of the accounts. . . . Venture Group's operational program was deeply flawed and indicates that nearly half of all accounts sold were auto-activated . . . in order to avoid chargebacks.

*Id.* at 2-4. With respect to sub-agent misrepresentations, the August Letter added:

> Finally, we also refer to the consistent misrepresentations by Venture Group (e.g., Spectrum, Charter, ATT as merged with Vonage or as partners of Vonage) which Venture Group failed to terminate, whether or not done through its Sub-Agents. Venture Group allowed these misrepresentations to continue and failed to take the necessary actions to end this pattern of inducing customers to buy Vonage through these falsehoods. Our records show that these misrepresentations were complained of by customers as late as June 28, 2019. As an example, one account we recently reviewed was fully refunded due to . . . the customer being misled that its account would be merged with its Spectrum account.

*Id.* at 4. The August Letter concluded: "Based on Vonage's finding of a consistent pattern of

malfeasance, recklessness and ongoing discovery of its misrepresentations, . . . Vonage hereby terminates the Agreement for cause pursuant to Section 8, effective immediately." *Id.*

### IV. Procedural History

Venture filed the instant action on May 28, 2020, alleging that Vonage had breached the CPA by, among other things, failing to provide "adequate support" to Venture, failing to provide Venture "sufficient training," failing to "collaborate with Venture in good faith to optimize the provision of services," wrongfully issuing chargebacks, and wrongfully terminating the CPA without opportunity to cure. Compl. ¶¶ 101-113. Venture also brought related claims for breach of the covenant of good faith and fair dealing, promissory estoppel, and quasi-contract. Vonage filed counterclaims for breach of the CPA, unjust enrichment, fraud, tortious interference with business relations, and civil violations of the Racketeer Influenced and Corrupt Organizations Act and New York General Business Law § 349. After Venture moved to dismiss Vonage's counterclaims, which the Court granted in part and denied in part, only Vonage's breach of contract and fraud counterclaims moved forward.

At the conclusion of discovery, Vonage moved for summary judgment as to all of Venture's claims and Vonage's breach of contract counterclaim.[2] On March 16, 2023, the Court ordered supplemental briefing with respect to Venture's election of remedies defense, an issue that is central to the disposition of these claims but which had not been fulsomely briefed. *See Venture Grp. Enterprises, Inc. v. Vonage Bus. Inc.*, 2023 WL 2975203, at *2 (S.D.N.Y. Mar. 16, 2023). With that supplemental briefing now complete, the Court turns to the dispute at hand.

### LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material

---

[2] Vonage also moved to exclude the opinions and testimony of Venture's damages expert, Ariel Collins. Because the Court grants summary judgment in favor of Vonage, that motion is now moot.

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009) (internal quotation marks omitted). A fact is material if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary [under the substantive law] will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there is a genuine issue of material fact, the Court must view all facts "in the light most favorable to the non-moving party." *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

While "[t]he movant has the burden of showing that there is no genuine issue of fact," the non-moving party "is not thereby relieved of [her] own burden of producing in turn evidence that would support a jury verdict." *Anderson*, 477 U.S. at 256. In other words, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial" to defeat summary judgment. *Id.*; *see also Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) ("[I]f the [defendant] has made a properly submitted motion [for summary judgment], the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden . . . .").

## DISCUSSION

### I.    Venture's Breach of Contract Claim

Venture contends that Vonage breached the CPA in a variety of ways, including failure to pay commissions owed, wrongful issuance of chargebacks, failure to provide adequate support to Venture's sales efforts, and wrongful termination of the agreement. "Under New York law, 'an action for breach of contract requires proof of (1) a contract; (2) performance of the contract

by one party; (3) breach by the other party; and (4) damages.'" *Bear, Stearns Funding, Inc. v. Interface Group-Nev., Inc.*, 361 F. Supp. 2d 283, 290 (S.D.N.Y. 2001) (quoting *First Invs. Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998)). However, "[a] fundamental principle of contract law provides that the material breach of a contract by one party discharges the contractual obligations of the non-breaching party." *Id.* at 291 (citing *In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997)). Vonage, relying on Section 8.2.1 of the CPA, contends that Venture materially breached the Agreement when Venture's sub-agents made false and misleading statements to customers, which discharged any of Vonage's contractual obligations. Vonage further argues that, because Venture intentionally hid those misrepresentations from Vonage, Venture was not entitled to a thirty-day opportunity to cure, and Vonage properly terminated the CPA for cause on August 2, 2019.

As the Court noted in its March 16, 2023 Order, and as detailed above, the record is replete with evidence of misrepresentations made by Venture's sub-agents, as well as Venture's attempts to cover up the problem. *See, e.g.*, Fioccola Decl., Ex. 14 ("Customers are stating they were told that Spectrum and Vonage were merging / buying each other out. Customers are . . . [u]nder the assumption they don't have a choice to switch – which is inaccurate and misleading."); *id.*, Ex. 17 ("The customer stated he was misled, he was told that 'Vonage is taking over Spectrum services.'"); *id.*, Ex. 20 ("[Vonage] did have a significant percentage of customers cancel due to what appears to be pretty clear misrep issues. This was the cancel reason we got on 15-20% of their customers after we had paid them for the order on submitted from info from Vonage or our calls to customers."); *id.*, Ex. 34 ("Please delete the following note on this order. We do not want Vonage to see this note . . . Customer is upset because they claim that they have been misled and lied to on numerous occasions."); *id.*, Ex. 36 ("We really want to

make sure we sanitize these before we send them to Vonage.  We should never tell Vonage that a customer cancelled because the agent lied to them, even if that is the reason.  The only makes us look bad, and may get us into trouble."); *see also id.*, Ex. 10, 11, 13, 15, 16, 34, 35, 37.  Venture attempts to dispute these facts in a conclusory manner, insisting that it "was not systemically withholding cancellation reasons from Venture," Pl. Supp. Opp. at 14, but the emails—which are all admissible against Venture as party opponent statements, *see* Fed. R. Evid. 801(d)(2)(A), (D)—speak for themselves.

  Instead, Venture's strongest argument in response to Vonage's allegations is the election of remedies defense.  Under New York law,

> The power to terminate a contract following a breach is one of election, requiring a choice between two inconsistent remedies available for the redress of a wrong.  When an executory contract is breached, the non-breaching party to the contract faces two options: he may either continue to perform under the contract or he may terminate the contract.  If the non-breaching party elects to continue performance, he may not later choose to terminate the contract on account of the breach.

*Bigda v. Fischbach Corp.*, 849 F. Supp. 895, 901 (S.D.N.Y. 1994) (internal citations omitted); *see also ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 383, 388 (S.D.N.Y. 1999).  "[T]he election of remedies doctrine requires knowledge of the alleged breach and an affirmative action that constitutes an election to continue performance."  *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 710 (S.D.N.Y. 2012); *see also CreditSights, Inc. v. Ciasullo*, 2007 WL 943352, at *9 (S.D.N.Y. Mar. 29, 2007) ("This doctrine requires that parties chose one remedy over another *knowingly*. When a party has two remedies inconsistent with each other, any decisive act by him, *done with knowledge of his rights and of the facts*, determines once [and] for all his election of his remedy." (emphasis in original) (internal quotation marks omitted)).

  Venture argues that Vonage cannot now claim breach based on the sub-agent

misrepresentations because it elected to continue the CPA until August 2019 despite knowing about the sub-agent misrepresentations earlier.  There is certainly some evidence in support of Venture's position.  On September 12, 2018, for example, Jessie Tallant at Vonage wrote to two Venture employees: "Recently this has been coming up more frequently ('Vonage bought Spectrum') as a cancellation reason.  Are the sales associates being coached/corrected?"  Boyle Decl., Ex. 31.  On another email dated November 28, 2018, Atul Sood, a Senior Director of Customer Care at Vonage, wrote to an internal team: "We have 20 examples since October in which Venture group accounts have claimed they were informed that Vonage has taken over Spectrum communications and they must switch."  Boyle Decl., Ex. 34.  In response, Angelique Electra, who was in-house counsel at Vonage, wrote on November 29: "[T]hese sales issues re Spectrum have to be addressed. If there is a pattern of misrepresentations, that not only seriously breaches the agreement but violates the law." *Id.*  There is also evidence that Vonage may have communicated their concerns to Venture in early 2019 but did not express a desire to terminate the CPA at that time.  On January 14, 2019, Thomas Greene sent an internal email stating:

> Vonage has been receiving complaints for a while now of customers being sold using the tactic that 'Vonage has partnered, Bought etc. their current provider' . . . [I]t has been decided by Vonage that when these types of complaints are uncovered (by the Vonage Save Team), Vonage will request the Sales recording.  We must supply the recording within 24 hours of Vonage requesting it or we will potentially be in breach of contract.

Boyle Decl., Ex. 27.  On February 1, 2019, Greene forwarded the January 14 email to Turpin, stating:

> [A] change was implemented (see below) that was communicated on 1/14/2019.  Vonage is very concerned with the Cancel reasons they are receiving from Customers as I communicated on 1/14/2019 regarding the use of misleading Sales Tactics.  At this point we and Vonage are not seeing the desired results we were looking for in regards to curbing this practice so the following will be in effect starting Monday February 4th.

*Id.*  The email then proceeds to explain the call recording policy.

With its supplemental briefing, however, Vonage offers evidence that it never fully understood the extent of the problem in late 2018 and early 2019, because Venture continued to obscure the truth even when confronted by Vonage. On November 29, 2018—the same day that Electra had said "these sales issues re Spectrum have to be addressed," Boyle Decl., Ex. 34— Reid emailed Turpin and Thomas Greene a list of customer cancellation reasons, including:

> [i] Customer was told they had to purchase the service because the losing provider was purchased by Vonage—Not many accounts but still an issue. . . . [ii] Sales person was deceptive – could be in the same bucket as item one, but the reason for cancelling was not because the losing vendor was purchased by Vonage – Still an issu[e] that needs to be addressed. . . . [iii] Sales agent committed fraud – This can be serious and needs to be address[ed].

Fioccola Supp. Decl., Ex. 58. He asked Turpin and Greene whether they would like to "research these accounts." *Id.* Turpin responded: "Our priority needs to be trying to put out the fires that [Vonage] Service Delivery is creating for us, not what I think will end up being manufactured baseless allegations," to which Reid replied, "[t]hey are not 'allegations' but notes from the retention team." *Id.* On January 3, 2019, Reid sent another email to Turpin with a customer complaint that a "salesperson told the customer that once Spectrum had bought out Time Warner, there was a monopoly in the area which resulted in some agency . . . allowing Vonage to swoop in and offer Spectrum's services for a lower price," which was false. Fioccola Decl., Ex. 59. Turpin insisted in response that "when we call these customers they normally have a totally different version of events," and later added, "I have doubts that this is [an] [a]ccurate version of what the customer said. I am very, very, clearly saying that I don't believe much of anything that service delivery reports to us. . . . We send [call] recordings that show how improbable it is that a customer could even have made such a complaint as what is alleged here." *Id.* Given these attempts by Turpin to deflect Reid's inquiries, the Court finds it doubtful—or at least far from certain—that Vonage was able to make an affirmative election to continue the CPA in

January 2019 with a full understanding of the sub-agent breaches.

In any event, even if Vonage made such an election in early 2019, it still "retains [the] option to terminate based on [a] subsequent breach." *Morrison v. Buffalo Bd. of Educ.*, 741 F. App'x 827, 831 (2d Cir. 2018) (citing *Awards.com, LLC v. Kinko's Inc.*, 834 N.Y.S.2d 147, 155-56 (1st Dep't 2007)); *see also ESPN, Inc.*, 76 F. Supp. 2d at 388 ("Once a party elects to continue the contract, it can never thereafter elect to terminate the contract based on that breach, although it retains the option of terminating the contract based on other, subsequent breaches."). The record—now supplemented with the additional evidence submitted by the parties— establishes that subsequent breaches did occur. *See, e.g.*, Fioccola Decl., Ex. 17 (email dated February 21, 2019 documenting a sub-agent misrepresentation); Fioccola Decl., Ex. 19 (email dated March 19, 2019 documenting a sub-agent misrepresentation); Fioccola Decl., Ex. 33 (spreadsheet listing cancellation reasons for customer accounts, reflecting at least 25 documented sub-agent misrepresentations throughout February, March, and April 2019); Fioccola Supp. Decl., Ex. 69 (email dated April 19, 2019, which reported: "Since our last update we have 24 new examples. Installation and misinformation continu[e] to lead as the biggest contributors to customer dissatisfaction"); Ficcola Supp. Decl., Ex. 71 (email dated June 18, 2019 documenting a sub-agent misrepresentation); *see also* Fioccola Supp. Decl., Ex. 68, 70.   The Fraud Department Investigation, while focusing on the improperly activated accounts, also uncovered at least a handful of canceled accounts documenting sub-agent misrepresentations.  *See* Fioccola Decl., Ex. 41; Venture Rule 56.1 Statement of Facts ¶ 267.   And the August Letter, which expressly terminated the CPA pursuant to Section 8, cited "the consistent misrepresentations by Venture Group (e.g., Spectrum, Charter, ATT as merged with Vonage or as partners of Vonage) which Venture Group failed to terminate, whether or not done through its Sub-Agents" as one of

the reasons for termination.  Fioccola Decl., Ex. 51, at 4. Venture points to no evidence in the record indicating that Vonage understood the extent of these subsequent breaches but elected to continue performance under the CPA.  Rather, the evidence paints the opposite picture: Despite previously trying to address the issue with Venture, Vonage discovered subsequent breaches during its investigation into Venture's sales practices, and less than one month after that investigation concluded, formally terminated the agreement. The election of remedies doctrine "permits parties to wait a 'reasonable time' after learning of the alleged breaches before terminating the contract," *Bigda*, 898 F. Supp. at 1012 (quoting *Cities Serv. Helex v. United States*, 543 F.2d 1306, 1313 (Ct. Cl. 1976)), and no reasonable juror could conclude, based on this evidence, that Vonage's actions—conducting a formal investigation into Venture's sales practices, completing that investigation in approximately four months, and terminating the CPA around three weeks after that investigation ended—were unreasonably delayed, or otherwise indicated an election to continue the contract despite the ongoing sub-agent misrepresentations. *See Grocery Haulers, Inc. v. C & S Wholesale Grocers, Inc.*, 2012 WL 4049955, at *17 (S.D.N.Y. Sept. 14, 2012) (concluding that the defendant "was entitled to conduct a reasonable [months-long] investigation to determine the nature and scope of [the plaintiff's] pattern of behavior prior to electing its remedy," because the defendant "could not render performance indicating to [the plaintiff] that it had made an election as to breaches the scope of which [the defendant] did not yet understand"); *Confirmit Inc. v. AND Agency, Inc.*, 2022 WL 4123979, at *4 (S.D.N.Y. Sept. 9, 2022) (concluding that a four-and-a-half month delay between the defendant's notice of the breach and its decision to terminate the contract was reasonable, because "the centrality of the [plaintiff's] contract was integral to [the defendant's] business model and as such counseled against precipitous action").  This is particularly true when Venture

attempted to conceal the extent of the problem from Vonage, making it much more difficult for Vonage to determine whether the CPA had been materially breached.  *See Barbagallo v. Marcum LLP*, 925 F. Supp. 2d 275, 288-91 (E.D.N.Y. 2013) (rejecting an election of remedies defense where the breaching party "deliberately concealed" his actions from the non-breaching party for several months).  Thus, Venture's attempt to invoke an election of remedies defense fails.[3]

Venture's remaining arguments, in both its initial and supplemental briefing, are also unpersuasive.  First, Venture argues that the breaches of Section 8.2.1 were immaterial, because Vonage continued to perform under the CPA.  But this argument confuses materiality with the election of remedies.   An election to continue performance under an agreement does not necessarily mean that the breach was immaterial; indeed, the election of remedies doctrine applies "when a party *materially* breaches a contract."  *Bigda*, 898 F. Supp. at 1011 (emphasis added); *see also Times Mirror Mag., Inc. v. Field & Stream Licenses Co.*, 103 F. Supp. 2d 711, 736 (S.D.N.Y. 2000).

To the extent that Venture otherwise challenges the materiality of Section 8.2.1, the Court is unconvinced.  A material breach is defined as "one which would justify the other party to suspend his own performance, or a breach which is so substantial as to defeat the purpose of the entire transaction."  *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 895 (2d Cir. 1976)

---

[3] Venture also points to a separate inquiry made by Vonage's customer care department in the spring of 2019, which tracked "actionable information" from customer complaints every two weeks, including sub-agent misrepresentations.  Fioccola Supp Decl., Ex. 67; *see also id.*, Ex. 66, 68, 69, 70, 71. Venture argues that, through this effort, Vonage gained enough knowledge about the subsequent misrepresentations to make an election before the August Letter.  There is no evidence in the record, however, as to what the outcome of this separate inquiry was, or whether the results were ever conveyed to Vonage management.  Furthermore, it was reasonable for Vonage to wait until the fraud department concluded its own investigation before terminating an agreement based on deceptive sales tactics.  In any event, as the Court concluded, no reasonable juror would find an investigation of several months to be unreasonable under these circumstances, whether it was conducted by Vonage's fraud department, its customer care department, or both.

(internal citation omitted).  Section 8.2.1 expressly allows Vonage to terminate the agreement in the event of "false representations" or "fraudulent activity" in connection with the sale of Vonage services, and the pattern of sub-agent misrepresentations over the course of almost two years—as well as Venture's attempts to hide them from Vonage—is clearly material.  *See* Fioccola Decl., Ex. 20 (internal Venture email from Turpin stating, "[Vonage] did have a significant percentage of customers cancel due to what appears to be pretty clear misrep issues.  This was the cancel reason we got on 15-20% of their customers . . . [i]t also influenced the poor install rate on the initial orders."); *cf. Orlander v. Staples, Inc.*, 802 F.3d 289, 298 (2d Cir. 2015) ("[T]he question of the materiality of a breach is usually a question of fact and should be decided as a matter of law only where the inferences are certain.").[4]

Second, Venture argues that Vonage did not properly terminate the CPA under Section 8.2.1 because it did not give Venture thirty days to cure any alleged breach.  But Section 8.2.1 states, in unambiguous terms, that Venture "will have the opportunity to effect the cure described in this section within thirty (30) days . . . *if each of the following is true* . . . you have not otherwise been negligent in your oversight or management of the Sub-Agent[,] you have not knowingly permitted or allowed such violations, [and] you took appropriate and prompt means to terminate and further prevent such violations upon becoming aware of such violations."  CPA § 8.2.1 (emphasis added).  Because Venture knew about the sub-agent misrepresentations as early as September 2017, *see* Fioccola Decl., Ex. 34, yet repeatedly hid the fraudulent activity from Vonage, Vonage was not obligated to provide an opportunity to cure.  Venture does not

---

[4] Relatedly, Venture argues that, because it substantially performed under the CPA, material breach is not available as a defense.  Venture has it backwards.  "Substantial performance is the antithesis of material breach.  If it is determined that a breach is material, it follows that substantial performance has not been rendered."  *Bernard v. Las Americas Commc'ns, Inc.*, 84 F.3d 103, 109 (2d Cir. 1996).  Because a violation of Section 8.2.1 is a material breach under the CPA, it follows that Venture did not render substantial performance.

offer any alternative interpretation of Section 8.2.1—rather, Venture merely insists that the provision "has the all-important right to cure," Pl. Opp. at 16, and ignores the limiting language on the cure provision. *See Blue Stone Ent. LLC v. AGS CJ Corp.*, 2022 WL 760748, at *2 (2d Cir. Mar. 14, 2022) (quoting *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996)) ("[I]f the contract is capable of only one reasonable interpretation, i.e., is unambiguous, we are required to give effect to the contract as written.").

Third, Venture argues that Vonage terminated the CPA under Section 8.1 through the June Letter, not under Section 8.2.1 through the August Letter. This argument is easily disposed of. By its express language, the June Letter is not a termination letter but a letter of non-renewal, *see* Fioccola Decl., Ex. 43, at 1 ("This is to notify you that Vonage will not renew the Agreement pursuant to Section 8.1 and it will automatically terminate on November 3, 2019."), whereas the August Letter "terminates the Agreement for cause pursuant to Section 8, effective immediately," Fioccola Decl., Ex. 51, at 4. Venture makes much of the fact that the August Letter only cites "Section 8," not Section 8.2.1 specifically, but the letter expressly addresses the "consistent misrepresentations by Venture Group . . . which Venture Group failed to terminate, whether or not done through its Sub-Agents," a clear reference to Section 8.2.1. *Id.* Moreover, the CPA contains no indication that termination under Section 8.2.1 and non-renewal under Section 8.1 could only be invoked mutually exclusively.

Fourth, Venture points to the fact that Vonage continued to pay commissions under Section 3.2 of the CPA long after the August Letter was sent on August 2, 2019. According to Venture, these payments demonstrate that Vonage did not terminate the CPA pursuant to Section 8.2.1, because the CPA does not require Vonage to continue paying commissions in the event of a Section 8.2.1 termination. Vonage asserts that it continued paying these residual commissions

19

until March 2020 in an attempt to resolve the parties' dispute over prior chargebacks and unpaid commissions. *See* Fioccola Decl., Ex. 46; Vonage Rule 56.1 Statement of Facts ¶ 81. In any event, while the CPA does not require Vonage to continue paying commissions after a Section 8.2.1 termination, it also does not prohibit it. Vonage's payment of post-termination commissions, on its own, does not override the unambiguous language of the August Letter terminating the CPA for cause pursuant to Section 8.

Finally, Venture argues that Vonage had ulterior motives in terminating the CPA, and used the sub-agent misrepresentations as a convenient excuse. In a similar vein, Venture argues that Vonage cannot terminate the CPA for the auto-activation issue, and that Vonage's attempt to do so is an "[a]fter-the-[f]act creation by Vonage." Pl. Supp. Opp. at 22. Regardless of Vonage's intentions, or the other grievances it may have had with Venture, that does not change the fact that Venture committed a material breach with respect to documented sub-agent misrepresentations, and Vonage properly terminated the contract on August 2, 2019—at least in part—because of that breach.

Vonage is thus entitled to summary judgment on Venture's breach of contract claim.

## II.     Venture's Remaining Claims

Venture also brings claims for breach of the covenant of good faith and fair dealing, promissory estoppel, and quasi-contract. These types of claims, however, can only move forward in the absence of a valid and enforceable contract governing the same subject matter. *See Keystone Food Holdings Ltd. v. Tyson Foods, Inc.*, 492 F. Supp. 3d 134, 153 (S.D.N.Y. 2020) ("New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pled."); *Holmes v. Lorch*, 329 F. Supp. 2d 516, 527 (S.D.N.Y. 2004) ("Promissory

estoppel is a rule applicable only in the absence of an enforceable contract."); *Nasdaq, Inc. v. Exch. Traded Managers Grp., LLC*, 431 F. Supp. 3d 176, 270 n.64 (S.D.N.Y. 2019) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."). Venture has offered no compelling reason to depart from this well-established rule. It argues that the parties amended the CPA in writing several times, but that does not change the fact that a written contract governs this dispute. Venture also argues that the parties amended the CPA through "course of conduct," but the CPA contains a merger clause that restricts the parties' agreement to the written contract and any written amendments. *See* CPA § 10.4 ("Except as otherwise provided in this Agreement . . . this Agreement may not be amended except by a writing signed by both parties."). The Court thus grants summary judgment in favor of Vonage on Venture's remaining claims as well.

### III.   Vonage's Breach of Contract Counterclaim

Vonage brings a breach of contract counterclaim based on the same misrepresentations made by Venture's sub-agents. As discussed, the record contains undisputed evidence that such breaches did occur. However, the Court must still consider if there is a genuine dispute of material fact as to whether any of *Vonage's* alleged breaches of the CPA discharged Venture's obligations under the agreement, such that Vonage's counterclaim would also fail. *See Bear, Stearns Funding, Inc.*, 361 F. Supp. 2d at 291.

Venture's breach of contract claims can be grouped into three categories: payment-related issues, support-related issues, and wrongful termination of the CPA. The Court has already concluded that the wrongful termination claims fail, because Vonage properly terminated the CPA under Section 8.2.1 in August 2019. With respect to payment-related issues, Venture

alleges that Vonage failed to pay commissions owed for customer accounts; wrongfully issued chargebacks; failed to make 200% MRC payments; and failed to make 400% MRC payments after December 2017.  None of these claims raise a material dispute of fact.  Under Section 3.2 of the CPA, Vonage is no longer obligated to pay commissions if the agreement is terminated pursuant to Section 8.2.1.  Section 3.1 further states that Vonage may issue chargebacks at any time where such chargebacks are "attributed to a violation of Section 8.2 by you or a Sub-Agent."  The Court sees no written provision in the record obligating Vonage to make 200% MRC payments, and while Amendment #4 to the CPA provided for 400% MRC payments, that provision expressly states that such payments would end in December 2017.

With respect to support-related issues, Venture broadly claims that Vonage "fail[ed] to provide adequate support to Venture, agents, or customers" and "fail[ed] to collaborate with Venture in good faith to optimize the provision of services."  Compl. ¶¶ 103, 106.  Section 4 of the CPA, however, states in unambiguous terms that "[Vonage] has no liability for commissions that might have been earned but for the *failure* or inability of [Vonage] to provide the services to any customer."  CPA § 4 (emphasis added); *see also* CPA § 1.1 ("Under this program [Venture] will . . . market [Vonage] Services and own the end-to-end sales process.").  Venture argues that Section 4 is a "boilerplate warranty provision designed to address hardware failures and outages beyond Vonage's control that might affect providing service to any customer."  Venture Rule 56.1 Statement of Facts ¶ 422.  But Venture provides no factual basis for this conclusion, in the terms of the CPA or otherwise.  The Court declines to read additional terms into Section 4 that are not there.  *See Law Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) ("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of

interpreting the writing."); *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 137 (2d Cir. 2001) ("When the language of [a contract] is unambiguous, we will not read additional terms into the contract.").[5]

Venture has thus failed to establish a triable issue of fact as to any of Vonage's alleged breaches, and Vonage is entitled to summary judgment on its breach of contract counterclaim.

## CONCLUSION

For the foregoing reasons, Vonage's motion for summary judgment is granted in full. The action shall no longer be stayed and no later than October 20, 2023, the parties shall file a joint letter proposing next steps in this action.  The Clerk of Court is respectfully directed to terminate the motions pending at ECF No. 159, 167, and 168.

SO ORDERED.

Dated:  October 6, 2023
        New York, New York

Ronnie Abrams
United States District Judge

---

[5] Venture points to one additional provision that may impose obligations on Vonage: Section 1.2 of the CPA, which provides, in relevant part, that Vonage "shall not take actions . . . it has reason to believe would circumvent [Venture] from earning or receiving Commissions with respect to Customers acquired by [Vonage] through [Venture] pursuant to this Agreement."  CPA § 1.2.  Section 1.2 further states, however, that the obligations described therein do not survive "termination by Vonage Business pursuant to Section 8.2."  *Id.*  Even if Section 1.2 were applicable, notwithstanding Vonage's termination of the CPA under Section 8.2.1, Venture fails to raise a material dispute of fact as to whether Vonage "circumvent[ed]" Venture from earning or receiving commissions with respect to existing customers.  For example, Venture alleges that Jared Morling, who led Vonage's Service Delivery Department, opposed a "teaming" deal for Venture, which was "a way for Venture to participate in larger sales opportunities in conjunction with Vonage['s] direct sales team."  Venture 56.1 Statement ¶¶ 201, 406.  But Venture does not indicate that "teaming" opportunities had anything to do with existing customers already acquired by Venture.  Venture also complains of Vonage's failure to pay invoices for TechLink, a company that assisted with on-site installations.  There is no evidence in the record, however, that Vonage had "reason to believe" such failures would "circumvent" Venture from receiving properly earned commissions.  Rather, these "failures" are precisely the type of conduct that is protected by Section 4 of the CPA.