UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VENTURE GROUP ENTERPRISES, INC.,

                Plaintiff,

           v.

VONAGE BUSINESS INC., *F/K/A*
VONAGE BUSINESS LTD.,

                Defendant.

No. 20-CV-4095 (RA)

<u>OPINION & ORDER</u>

---

RONNIE ABRAMS, United States District Judge:

       Venture Group Enterprises, Inc. ("Venture") brought this action against Vonage Business Inc. ("Vonage"), asserting a host of claims arising from the parties' business relationship, in which Venture was to sell Vonage's voice over internet protocol (VOIP) services pursuant to a Channel Partner Agreement (CPA). Vonage in turn brought counterclaims against Venture based on the same CPA. Following the Court's ruling on Venture's motion to dismiss and Vonage's motion for summary judgment, as well as a partial voluntary dismissal, only Vonage's counterclaim for breach of contract remained. The Court granted summary judgment in favor of Vonage, finding that Venture breached the CPA. The case then proceeded to a bench trial to determine the extent of damages Venture owed Vonage, if any. The Court now finds that Vonage is not entitled to liquidated damages, but that it is entitled to nominal damages for commissions it paid to Venture as well as for lost profits.

**BACKGROUND**[1]

## I.  The Parties and Their Channel Partner Agreement

Vonage defines itself as a "leading provider of cloud-based communications applications and solutions for the commercial business market." PX011 at 1. It contracted with Venture, a "business solutions provider" which aims to expand carriers' markets, Trial Tr. at 296:8–17, to sell its services through a network of sub-agents pursuant to a Channel Partner Agreement or CPA, which the parties entered into on November 5, 2015, *see* PX011 at 1. Pursuant to the CPA, Venture's role was "to market, promote, sell and support [Vonage's] products and services." *Id.* Section 2 of the CPA describes Venture's "[o]bligations and [r]estrictions." *Id.* § 2. Section 2.5 requires Venture and its sub-agents to "truthfully and correctly communicate the availability, features, rates, and related information regarding [Vonage's] Services," *id.* § 2.5, and Section 2.10 prohibits Venture and its sub-agents from "knowingly mak[ing] any false statement, misrepresentation, negative comment, half-truth or unrealistic promise or commitment about [Vonage's] Services, a Customer Contract, or [Vonage] to anyone." *Id.* § 2.10.

Section 3 of the CPA covers the commissions due to Venture based on its sales. *Id.* § 3. Per Appendix A of the CPA, Venture was to "receive monthly residual Commissions" from Vonage, *id.* at App'x A §§ 1.2–1.3, which were to be paid "after termination of [the CPA] for Customers procured by [Venture] for as long as such Customers continue to utilize the Services" unless Vonage terminated the CPA "pursuant to Section 8.2.1," *id.* § 3.2. Although Vonage was entitled to "charge back" overpayments of commissions it made to Venture under certain circumstances, it could "not charge back any alleged overpayment of Commissions to [Venture] more than one

---

[1] The Court discusses only the facts and procedural history that are relevant to Vonage's remaining counterclaim.

hundred and twenty (120) days after the overpayment unless such chargeback is attributed to a violation of Section 8.2 by [Venture] or a Sub-Agent." *Id.* § 3.1.

Section 8 of the CPA outlines termination. *See id.* § 8. Section 8.2 provides that "either party may terminate this Agreement if the other party fails to perform a material obligation under this Agreement and does not remedy such failure within thirty (30) days after receiving written notice from the other party." *Id.* § 8.2. Section 8.2.1 further specifies that "[Vonage] may terminate this Agreement (reserving cumulatively all other rights and remedies at law and in equity unless otherwise expressly stated herein) and any further compensation . . . upon [Venture's] failure to cure within the 30 day cure period . . . if [Venture]: (1) . . . intentionally or recklessly made any materially false representation, report or claim in connection with the sale of [Vonage's] services; or (2) [e]ngage[d] in any unlawful or fraudulent activity in connection with the sale of [Vonage's] Services." *Id.* § 8.2.1. Venture was liable under the CPA for the acts of its sub-agents. *See id.* § 1.1.

On March 17, 2017, the parties signed Amendment #1 to the CPA. *See* PX016 at 2. Exhibit B, Section 1 of Amendment #1 covers "Sales Call Recording, Vonage Retrieval Rights and Retention Requirements." *Id.* at Ex. B § 1. It states in relevant part that "[o]n all telemarketing transactions resulting in a sale or upsell, [Venture] will verify and record the verbal contract portion of each sales call via Vonage approved scripting (including any welcome call)." *Id.* Section 2 defines a "welcome call" as "a post-sale verification process." *Id.* at Ex. B § 2. "Failure to produce a comprehensible recording" would "result in a $500 penalty," and "[m]ore than 3 failed deliveries in the current month" would "result in a penalty increase to $1,000 per failed recording delivery in the current month." *Id.* at Ex. B § 1. Section 3 of Exhibit B, which covers "Contracts," provides that "if [Venture] fail[ed] to," among other things, "fully record a sale conducted through telesales" or "otherwise materially compromise[d] the legal validity of the sale in Vonage's good faith

3

determination, then [Venture] is not entitled to Commissions for such sale until such issues [were] cured to Vonage's reasonable satisfaction." *Id.* at Ex. B § 3.

## II. Procedural History

The parties' business relationship eventually broke down and, on May 28, 2020, Venture initiated this lawsuit against Vonage, bringing claims for breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppel, and quasi-contract. Venture's breach of contract claim was based in part on Vonage's failure to provide adequate support to Venture by not timely installing the technology needed to activate the accounts of Venture-procured customers and on Vonage's wrongful issuance of chargebacks of Venture's commissions. Vonage filed counterclaims for breach of contract, unjust enrichment, fraud, tortious interference with business relations, and civil violations of the Racketeer Influenced and Corrupt Organizations Act and New York General Business Law § 349. On September 15, 2021, the Court granted in part and denied in part Venture's motion to dismiss Vonage's counterclaims, leaving Vonage's counterclaims for breach of contract and fraud remaining. *See* ECF No. 104.

After discovery concluded, Vonage moved for summary judgment on all of Venture's claims and on Vonage's own counterclaim for breach of contract. On October 6, 2023, the Court granted Vonage's motion for summary judgment in its entirety. Regarding Vonage's counterclaim for breach of contract, the Court held that "the record contains undisputed evidence that such breaches did occur." *See* ECF No. 237 at 21. The Court stated that "Section 8.2.1 expressly allows Vonage to terminate the agreement in the event of 'false representations' or 'fraudulent activity' in connection with the sale of Vonage services, and the pattern of sub-agent misrepresentations over the course of almost two years—as well as Venture's attempts to hide them from Vonage—is clearly material." *Id.* at 18. The Court further noted that "[u]nder Section 3.2 of the CPA, Vonage

is no longer obligated to pay commissions if the agreement is terminated pursuant to Section 8.2.1"
and that "Section 3.1 further states that Vonage may issue chargebacks at any time where such
chargebacks are 'attributed to a violation of Section 8.2 by [Venture] or a Sub-Agent.'" *Id.* at 22.
The case then proceeded to a bench trial to determine damages for Vonage's breach of contract
counterclaim.[2]

## III. Relevant Pretrial Motions and Trial

In advance of the trial, Vonage advised the Court that it would be seeking the following
damages: (1) recoupment of commissions it paid to Venture from the date of Venture's breach; (2)
liquidated damages for Venture's failure to provide full recordings of sales calls; and (3) lost profits
derived from calculations that Venture's expert presented in support of Venture's claim for breach
of contract. *Id.* at 4. Trial was originally scheduled to begin on February 12, 2024.

The Court held a pretrial conference on February 9, 2024 during which it ruled on the
parties' numerous motions in limine. In one such motion, Venture sought to preclude Vonage from
introducing the deposition testimony of Ariel Collis, an expert Venture hired to support its own
claim that Vonage owed it lost profits for Vonage's breach of the CPA. The Court noted that it was
a "close[] question . . . as to whether Venture had notice that Vonage's theory of lost profit damages
would be based on Collis'[] models," and that "it would be prejudicial to allow Collis'[] testimony
in without granting Venture the opportunity to further pursue an examination of whether Collis'[]
model applies to Vonage's damages." Pre-Trial Conference Tr., Feb. 9, 2024, ECF No. 300 at
46:23–25, 47:22–48:1. To that end, the Court denied Venture's motion in limine, but adjourned the

---

[2] In the parties' proposed pretrial order, they advised the Court that they jointly stipulated to dismiss with prejudice
Vonage's counterclaim for fraud. *See* ECF No. 294 at 10.

trial to provide Venture the opportunity to depose Collis on this issue or otherwise address the issue further. *See id.* at 48:3–7; ECF No. 295 at 1; ECF No. 305.

Trial ultimately began on August 26, 2024. On the first day of trial, Vonage began by presenting the testimony of its sole witness, Emily Haniff, a Vice President at Vonage where she leads Vonage's Commissions and Revenue Assurance Team. Haniff Aff. ¶¶ 1, 4. Consistent with the Court's individual rules, Haniff's direct testimony was admitted via affidavit, which included a number of attached exhibits, while her cross-examination and redirect testimony was elicited through live testimony. Following Haniff's testimony, which continued through August 27, 2024, Vonage rested.

Later that afternoon, Venture called its first witness, Doug Turpin, Venture's founder and President. *See* Trial Tr. 296:4–5; PX011 at 1. The trial recommenced on August 29, 2024 with Collis' testimony. Vonage declined to cross-examine Collis. *See* Trial Tr. 428:5–8. Following Collis' testimony, Turpin returned to the stand to continue his direct examination, which was completed on August 30, 2024. Turpin's cross-examination and redirect testimony also concluded that day, and Venture rested.

Following trial, the parties submitted post-trial briefing on September 16, 2024.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

"In order to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l.*

*v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).[3] At summary judgment, the Court determined that Vonage performed its obligations pursuant to a valid contract—the CPA—which Venture breached. *See* ECF No. 237 at 11. The sole issue at trial was thus the amount of damages, if any, that Vonage was entitled to as a result of Venture's breach.

Vonage seeks three categories of damages: (1) commission payments it made to Venture following the earliest documented instance of Venture's initial breach, September 6, 2017; (2) liquidated damages for what it argues are incomplete call recordings of each sales call made by Venture on or after September 6, 2017 to customers who later canceled their accounts; and (3) lost profit damages as a result of Venture's breach and Vonage's resulting termination of the CPA. The Court sets forth its findings of fact and conclusions of law for each category of damages in turn.

## I.  Legal Standards

To recover damages for a breach of contract, the party seeking damages must prove by a preponderance of the evidence "the *fact* of damage[s]," *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016), that flow "direct[ly] and proximate[ly]" from the breach, *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007). This requires the party to show that the damages it seeks are "not merely speculative, possible, and imaginary, but . . . reasonably certain and such only as actually follow or may follow from the breach of the contract." *Id.* (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205, 209 (N.Y. 1886)) (emphasis omitted). "'Certainty,' as it pertains to general damages, refers to the *fact* of damage, not the amount." *Id.* Once the party seeking damages proves by a preponderance that it incurred damages due to the opposing party's breach, it "need only show 'a stable foundation

---

[3] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, omissions, and alterations.

for a reasonable estimate' of the damages incurred as a result of the breach." *Id.* at 110–11 (quoting *Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 383 (N.Y. 1974)). "Establishing a 'stable foundation for a reasonable estimate' requires putting forth a plausible theory that amounts to something more than a speculative measure of damages." *Cottam v. Glob. Emerging Cap. Grp., LLC*, No. 16-cv-4584, 2021 WL 1222120, at *5 (S.D.N.Y. Mar. 31, 2021), *aff'd sub nom. Cottam v. 6D Glob. Techs., Inc.*, No. 21-1031, 2022 WL 16908708 (2d Cir. Nov. 14, 2022).

If the party seeking damages has set forth a reasonable estimate of damages, then "the burden of uncertainty as to the amount of damages is upon the wrongdoer." *Id.* at 11. "[T]he party who has caused the loss may not insist on theoretical perfection." *Id.* If the party seeking damages has not set forth a reasonable estimate, however, "[u]nder New York law, nominal damages are always available in a breach of contract action even if a party cannot prove . . . damages." *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 976 F.3d 239, 248 n.10 (2d Cir. 2020) (collecting cases).

## II. Commission Damages

Vonage seeks to claw back every commission it paid to Venture following the first identifiable date of Venture's breach. Vonage argues that an award of such damages was not contemplated by the CPA and would result in a windfall.

The Court finds that Vonage did, in fact, incur damages when it paid commissions to Venture for accounts that Venture's sub-agents procured through misrepresentations, thereby breaching the CPA. As the Court held at summary judgment, Venture knew that its sub-agents were engaging in false representation and fraudulent activity to procure Vonage customers, resulting in Venture's breach. *See* ECF No. 237 at 11–12. During trial, on cross-examination, Venture's President, Doug Turpin, even admitted that at least some of the sales that Venture's sub-agents

made to Vonage customers were tainted by sub-agent misrepresentation. *See* Trial Tr. 653:5–15 ("Nobody disputed the fact that there were a very small percentage of sales" involving sub-agent misrepresentations.).

Vonage has, however, failed to provide the Court with a reasonable estimate of the commission-based damages to which it is entitled. According to Vonage, because Venture breached Section 8.2.1 of the CPA by September 6, 2017, it is entitled to *all* commissions it paid Venture from that point forward. *See* Vonage Post-Trial Br. at 8. Vonage argues that, at that point, its "obligations to pay Venture anything, including any commissions, ended, as did any other obligations Vonage had under the CPA." *Id.* Vonage thus seeks $2,195,214.38 in pre-interest damages on paid commissions. *Id.* Venture, by contrast, insists that the CPA provides Vonage the ability to claw back commissions it paid to Venture after 120 days only where the commission was attributable to an account procured by fraud. Venture Post-Trial Br. at 127 ("The CPA is clear that to recover a commission, the commission must be 'attributed to' a violation of Section 8.2, which governs the breach of a material provision of the CPA."). Venture has the better reading of the CPA.

When deciding whether the amount of damages sought is reasonable, courts look to the language of the contract. *Cf. Process Am., Inc.*, 839 F.3d at 144 (considering whether an award of damages following a bench trial contradicted the contract's "damages cap"). To that end, the Court turns to the relevant provisions governing commission payments in the event that the CPA was terminated, namely Sections 3.1, 3.2, 8.2, and 8.2.1. Section 3 of the CPA covers commissions. Section 3.1 addresses Vonage's ability to "charge back" Venture for commissions already paid, and provides in relevant part that Venture is entitled to residual commissions "[f]or each Customer Contract [it] provide[s] to [Vonage]." PX011 at § 3.1. Section 3.1 further states that Vonage "may

not charge back any alleged overpayment of Commissions to [Venture] more than one hundred and twenty (120) days after the overpayment unless such chargeback is attributed to a violation of Section 8.2 by [Venture] or a Sub-Agent." *Id.* Section 3.2 covers Vonage's obligation to continue to pay Venture commissions on the accounts of Venture-procured customers even after the CPA has been terminated. It reads as follows: "[Vonage] shall continue to pay [Venture] Commissions after termination of this Agreement for Customers procured by [Venture] as long as such Customers continue to utilize the Services," "[u]nless this Agreement is terminated by [Vonage] pursuant to Section 8.2.1." *Id.*

Section 8 covers termination of the CPA. Section 8.2 states that "either party may terminate this Agreement if the other party fails to perform a material obligation under this Agreement" and it does not remedy the breach in thirty days, "subject to the . . . terms of . . . Section 8.2 and Section 3.2." *Id.* § 8.2. Section 8.2.1 in turn provides, in relevant part, that Vonage "may terminate this Agreement . . . and any other further compensation . . . upon [Venture's] failure to cure within the 30 day cure period . . . if [it]: (1) . . . intentionally or recklessly made any materially false representation, report or claim in connection with the sale of [Vonage's] Services; or (2) [e]ngage[d] in any unlawful or fraudulent activity in connection with the sale of [Vonage's] Services." *Id.* § 8.2.1. Section 3.2, then states in relevant part that, "[u]nless this Agreement is terminated by [Vonage] pursuant to Section 8.2.1, [Vonage] shall continue to pay [Venture] Commissions after termination of this Agreement for Customers procured by [Venture] for as long as such Customers continue to utilize the Services." *Id.* § 3.2.

Under New York law, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (N.Y. 2002). A contract is ambiguous if "specific language is susceptible

of two reasonable interpretations," *Donohue v. Cuomo*, 38 N.Y.3d 1, 13 (N.Y. 2022), though it "does not become ambiguous merely because the parties urge different interpretations in the litigation," *Kennedy v. Basil*, 531 F. Supp. 3d 828, 841 (S.D.N.Y. 2021) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)). To determine whether a contract is ambiguous, courts turn first to the "four corners of the document." *Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (N.Y. 2011). In so doing, courts should not read language "in isolation because the contract must be considered as a whole." *Id.* at 185. By considering the entire contract, a court "safeguard[s] against adopting an interpretation that would render any individual provision superfluous," *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003), as courts "disfavor" such interpretations, *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002). Only where a court finds a contract ambiguous by its terms may it consider extrinsic evidence to clarify its meaning. *Brad H.*, 17 N.Y.3d. at 186.

Vonage urges the Court to find that Section 3.2—which relieves Vonage of its obligation to pay Venture commissions following the termination of the CPA if Venture was in violation of Section 8.2.1—governs the dispute. It neglects, however, to recognize that Section 3.2 covers the payment of *future* commissions following termination of the CPA. Here, by contrast, Vonage is seeking to claw back *past* commissions it has already paid to Venture, which are explicitly governed by Section 3.1. In instances where over 120 days have elapsed, as here, Vonage "may not charge back any alleged overpayment of Commissions to [Venture] . . . unless *such* chargeback is attributed to a violation of Section 8.2 by [Venture] or a Sub-Agent." PX011 § 3.1 (emphasis added). The Court declines to read the word "such" out of Section 3.1, which governs chargebacks, and instead reads the CPA to require that any particular commission Vonage seeks to recoup from Venture after 120 days of payment have resulted from a sale that has violated the CPA under

Section 8.2.[4] *See Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) ("[C]ourts may not by construction . . . excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.").

Accordingly, Vonage is entitled to damages for commissions that it paid to Venture on accounts that were procured via fraudulent misrepresentations. Vonage, however, has not shown that all of the commission payments it seeks to claw back are "attributed to," *id.* § 3.1, Venture's "failure to perform a material obligation," *id.* § 8.2, under the CPA. Indeed, not only did Vonage fail to identify any specific accounts procured via misrepresentation or fraud, it also failed to attempt to reasonably estimate a percentage of commissions paid on such accounts. The Court rejects this all-or-nothing approach argued by Vonage. Awarding Vonage the total amount of commissions it paid to Venture from the first date Vonage identified a breach would not "follow," *Tractebel*, 487 F.3d at 110, but rather run contrary to the remedies available to Vonage as set forth in Section 3 of the CPA.

If the Court were to hold that Vonage was entitled to all of the commissions it paid Venture from September 6, 2017 forward—regardless of whether or not these commissions were paid on accounts procured through misrepresentations by Venture or its sub-agents—that would put

---

[4] According to Vonage, the Court, in its opinion on summary judgment, already decided that "[i]n the event the CPA was terminated pursuant to Section 8.2.1, Vonage could cease to pay Venture's commissions [under] Section 3.2." Vonage Post-Trial Br. at 8 (quoting ECF No. 237 at 22). But Section 3.2 is not at issue here, as it governs payment of future commissions after the CPA is terminated, not the chargeback of commissions already paid. Vonage's argument that the Court also held on summary judgment that "Section 3.1 further states that Vonage may issue chargebacks at any time where such chargebacks are 'attributed to a violation of Section 8.2 by you or a Sub-Agent,'" *see id.* (quoting ECF No. 237 at 22), is similarly misguided. This statement is not inconsistent with the Court's interpretation of Section 3.1. At summary judgment, the Court examined Vonage's alleged breaches of the CPA to determine "whether any of *Vonage's* alleged breaches of the CPA discharged Venture's obligations under the agreement." ECF No. 237 at 21. One of Venture's claims was that Vonage wrongfully clawed back commissions paid on 125 accounts. *See id.* at 6–9, 22. The Court held that Vonage had been entitled to claw back these commissions because they pertained to specific accounts that Venture had improperly activated. At trial, however, Vonage never provided the Court with any additional, specific accounts procured by Venture in breach of the CPA on which it paid commissions that it is now seeking to claw back. *See* ECF No. 237 at 6–7, 21–22.

Vonage "in a *better* position than if the contract was performed." *Process Am., Inc.*, 839 F.3d at 143. Such an award would be contrary to the basic legal principle that "[d]amages for breach of contract are intended to place a party in the same position [it] would have occupied if the breach had never occurred" but "are not designed to create windfall recoveries." *Lucente v. Int'l Bus. Machs. Corp.*, 146 F. Supp. 2d 298, 304 (S.D.N.Y. 2001). Here, Vonage received revenue from the customers Venture procured. Haniff testified, for example, that from October 1, 2017 through the end of 2023, "Vonage has actually received on Venture accounts" $8,312,883 in revenue. Haniff Aff., App'x E at ¶ 4. To permit Vonage to recoup commissions for *all* customer accounts procured by Venture after September 6, 2017—including those that were properly procured under the terms of the CPA—would provide a benefit far beyond that for which the parties bargained.

To be sure, Vonage could charge back Venture for the commissions it paid on accounts "attributed to" Venture's or its sub-agents' misrepresentations. Although at trial Vonage certainly presented evidence that Vonage's sub-agents "deceiv[ed] and defraud[ed] customers," in violation of Section 8.2, *see, e.g.*, Haniff Aff., App'x A, it failed to provide the court with an estimate of how many accounts were procured by Venture in such fashion, *Freund*, 34 N.Y.2d at 383, let alone what Vonage paid in commissions on such accounts. Because the Court thus cannot calculate the amount of commission damages Vonage would be entitled to recoup, Vonage has failed to meet its obligation of providing a "reasonable estimate" of its damages on commissions it is entitled to claw back from Venture.

For these reasons, the Court denies Vonage's request for damages in the amount of all commissions it paid to Venture from September 6, 2017 onward, but awards Vonage nominal damages.

### III. Liquidated Damages

Vonage, pursuant to Amendment #1 of the CPA, seeks $500 for every account procured by Venture that was later canceled due to Venture's failure to record the entirety of each sales call, including the sales pitch.[5] Venture argues that the CPA never required it to record the initial sales pitch portion of a call and that, in any case, Amendment #1 contains an unenforceable penalty clause.

"Although freedom of contract is at the core of contract law, the freedom to contract does not embrace the freedom to punish, even by contract." *CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 374 (S.D.N.Y. 2019). New York law "provides that a contractually agreed upon sum for liquidated damages will be sustained where (1) actual damages may be difficult to determine and (2) the sum stipulated is not plainly disproportionate to the possible loss." *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 70 (2d Cir. 2004). A liquidated damages provision that "operates to 'secure performance by . . . compulsion'" is "disallowed as against public policy." *GFI Brokers, LLC v. Santana*, No. 06-cv-3988, 2009 WL 2482130, at *1 (S.D.N.Y. Aug. 13, 2009) (quoting *Truck Rent–A–Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 (N.Y. 1977)).

Whether a contractual provision "represents an enforceable liquidation of damages or an unenforceable penalty is a question of law" that depends on "the nature of the contract and the circumstances." *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380 (N.Y. 2005). "Whether a sum is to be treated as liquidated damages or as a penalty depends upon the intent of the parties to a contract as disclosed by the situation and by the terms of the instrument." *CVS Pharmacy*, 377

---

[5] The parties do not appear to dispute that Venture provided Vonage with recordings of particular portions of the sales calls Vonage requested, including the welcome call and the verbal contract, but did not provide recordings of the sales pitch portions of these calls.

F. Supp. 3d at 375–76 (quoting *Seidlitz v. Auerbach*, 230 N.Y. 167, 173–74 (N.Y. 1920)). "Generally . . . where the damages fixed are plainly disproportionate to the injury[,] the stipulated sum will be treated as a penalty." *Id.* (quoting *Seidlitz*, 230 N.Y. at 173–74). Although "liquidated and actual damages are mutually exclusive remedies under New York law," *U.S. Fid. & Guar. Co.*, 369 F.3d at 71, a party may recover for both types of damages where "the predicate for the awards differ in kind," *Framan Mech., Inc. v. Dormitory Auth. of State of N.Y.*, 63 Misc. 3d 1218(A), at *8 (N.Y. Sup. Ct. 2019). "The burden is on the party seeking to avoid damages"—here, Venture—"to show that the stated liquidated damages are, in fact, a penalty." *JMD Holding Corp.*, 4 N.Y.3d at 380.

The liquidated damages provision at issue is found in Exhibit B of Amendment #1 to the CPA. *See* PX016 at Ex. B §1. Section 1 of Exhibit B covers "Sales Call Recording, Vonage Retrieval Rights and Retention Requirements." *Id.* It lays out Venture's obligation to record sales calls made to Vonage customers and to pay Vonage a fixed amount for any such recording requested by Vonage that Venture fails to provide. *Id.* As a threshold matter, the parties dispute the scope of Amendment #1's recording requirements. Vonage argues that Amendment #1 required Venture and its sub-agents to record and provide upon request the entirety of a call to a customer, including the sales pitch. Venture, on the other hand, argues that Amendment #1 required it to record and provide only specific, key points in the call, which did not include the sales pitch portion. Venture has the better reading of the CPA.

To determine whether Venture was obligated by the CPA to record the sales pitch portion of calls to customers, the Court once again begins its inquiry within the "four corners of the document." *Brad H.*, 17 N.Y.3d at 186. Pursuant to Section 1 of Exhibit B, Venture was required to "verify and record the verbal contract portion of each sales call via Vonage approved scripting

(including any welcome call) or upsell and all required disclosures provided by Vonage" for "all telemarketing transactions resulting in a sale or upsell." PX016, Ex. B § 1. Section 2 of Exhibit B, which covers "TPV [Third-Party Verification] Recording" defines the "welcome call" as a "post-sale verification process." *Id.* at Ex. B § 2. Venture's "[f]ailure to produce a comprehensible recording over [would] result in a $500 penalty." *Id.* at Ex. B § 1. "More than 3 failed deliveries in the current month [would] result in a penalty increase to $1,000 per failed recording delivery in the current month." *Id.*

Section 3 of Exhibit B covers "Contracts" and states, as relevant here, that if Venture "fail[ed] to (i) fully record a sale conducted through telesales; (ii) verify the validity of an orally effected sale through a TPV recording; . . . or (iv) otherwise materially compromise[d] the legal validity of the sale in Vonage's good faith determination" then it would not be "entitled to Commissions for such sale until such issues are cured to Vonage's reasonable satisfaction." *Id.* at Ex. B § 3. Section 3 does not mention the $500 or $1,000 "penalty" discussed in Section 1. Additionally, Exhibit A of Amendment #1, which covers "Initial Flow," provides that "[a]ny sale made via telesales with a verbal contract and TPV shall have a recorded welcome call to the customer confirming the order specifics and the customer's understanding of what they ordered." *Id.* at Ex. A.

Vonage grounds its argument that Venture was required to record the entirety of sales calls, including the sales pitch, in Section 3 of Exhibit B. Vonage Post-Trial Br. at 2 & n.6; *see id.* at 10 & n.30. As stated above, Section 3 does refer to Venture's obligation to "fully record a sale," but it does not define the scope of what a "full" recording of a "sale" entails, nor does it specify a penalty for the failure to fully record such a call. In context, Section 3 concerns the verbal contracts that Venture and its sub-agents made with customers and is meant to ensure that such contracts are

16

legally valid. *See* PX016, Ex. B § 3 (discussing the need for Venture to obtain signatures on contracts, provide third-party verification, ensure agreements are legally valid, and provide customers with copies of all documentation). The consequence discussed in Section 3 for Venture's failure to comply, moreover, is not a fine per incomplete call recording, but rather the withholding of commissions until Venture "cured" any issues "to Vonage's reasonable satisfaction." *Id.*

Venture's argument, by contrast, is—more appropriately—grounded in Section 1 of Exhibit B. The heading of Section 1 clearly states that its purpose is to cover "[s]ales [r]ecordings," "Vonage['s] [r]etrieval [r]ights," and "[r]etention [r]equirements." *Id.* at Ex. B § 1. It sets forth specific "penalt[ies]" for Venture's failure to provide Vonage with required sales call recordings. *Id.*; *see CVS Pharmacy*, 377 F. Supp. 3d at 374–75 (explaining that liquidated damages provisions are those in which "contracting parties . . . agree between themselves as to the amount of damages to be paid upon breach rather than leave that amount to the calculation of a court or jury"). And this Section clearly states that Venture was required to "record the verbal contract portion of each sales call" "including any welcome call." *Id.* Because Section 1 "specifically enumerate[d]" the portions of the call to be recorded, "it mean[t]" for Section 1 of Exhibit B "to cover the specific items listed" as those Venture was obligated to record, "and to exclude other" portions of the call that Venture was not required to record. *Sigmon for Hindin v. Goldman Sachs Mortg. Co.*, No. 12-cv-3367, 2018 WL 1517189, at *3 (S.D.N.Y. Mar. 26, 2018) (also stating that the principle of "*expressio unius est exclusio alterius*[,] i.e., to express or include one thing implies the exclusion of the other, or of the alternative," applies to contracts governed by New York law), *aff'd sub nom. Sigmon, Tr. for Hindin v. Goldman Sachs Mortg. Co.*, 800 F. App'x 25 (2d Cir. 2020).

For these reasons, Vonage's argument that the sales pitch was "the most important part of the call" because it would indicate "what the sub-agent said to the potential customer to convince

her to switch to Vonage," Vonage Post-Trial Br. at 10–11, 16, is misplaced. The contractual language was clear: Venture was obligated to record "the verbal contract portion of each sales call via Vonage approved scripting (including any welcome call)." PX016 at Ex. B § 1. No more or no less was required.

Because it has determined that the CPA is itself clear, the Court need not look to extrinsic evidence to determine whether Venture's sub-agents were required to record the sales pitch portion of their calls.[6] Even if it did, however, the extrinsic evidence Vonage presented at trial does not prove by a preponderance its assertion that Venture was required to make these recordings. First, the Court gives little weight to Haniff's testimony that Venture was required to "*fully record a sale* conducted through telesales." *See, e.g.*, Haniff Aff. at ¶ 13. Haniff did not claim to have any personal knowledge of the CPA's formation; indeed, on cross-examination she acknowledged that paragraphs 11–16 of her affidavit, which concern Venture's obligations for recording sales calls, were based upon her reading of the contract and consultation with her legal counsel. *See* Trial Tr. 49:16–50:13.

The handful of emails Vonage presented in which various employees of Venture requested sales pitch portions of the calls from their sub-agents, is similarly unpersuasive. *See, e.g.*, Vonage Post-Trial Br. at 12–13.[7] In only one of these emails does the Venture employee state that its request is based on its effort to comply with the CPA. In it, Venture Vice President Thomas Greene informed Venture's sub-agents that Venture "must supply the Sales recording," including the sales pitch portion of the call, "within 24 hours of Vonage requesting it or we will potentially be in

---

[6] Notably, Vonage itself urged the Court not to consider any "parol evidence" submitted by Venture, and instead insisted that it look only to the language in Amendment #1 to determine the parameters of Venture's obligation to record sales calls. *See* Vonage Post-Trial Br. at 11.

[7] For purposes of this discussion, the Court assumes without deciding that these exhibits are admissible.

breach of contract." DX051; see also T. Greene Dep. at 53:23–25. *But see id.* at 55:1–11 ("Q: Okay. So in this email, you're [t]elling Telcom that they need to record the full sales call recording, correct? A: Correct. . . . That was not a Vonage requirement. That was our requirement."). Although Vonage presented this evidence indicating that Greene believed the CPA required Venture to keep all portions of a sales call, Venture presented evidence that its President, Turpin, never believed that the CPA required it to keep that initial sales pitch portion of the call. *See* DX105 at 1. Other email evidence cited by Vonage provides examples of Venture asking its sub-agents for full sales recordings, but does not show that Venture requested such recordings for the purpose of compliance with the CPA or otherwise indicate that Venture believed the CPA required it to record the initial sales call. *See* DX042–43, DX109. To the contrary, these emails demonstrate that Venture had its own policy for its sub-agents to keep sales recordings for three years. *See* DX051. But whether Venture breached its own policy when its subcontractors failed to record sales pitch portions of the calls is not relevant to Vonage's claim for liquidated damages. Because the CPA did not require Venture's sub-agents to record the sales pitch portions of their calls, Vonage has not met its burden of proving by a preponderance that it was actually damaged per the terms of the CPA.

In any event, this attempt at recovery fails because the liquidated damages clause is an unenforceable penalty. As an initial matter, although a "[c]ourt must look to the substance of a [damages] provision, not its form, [it] need not ignore the fact that the parties referred to the payment obligation . . . as a 'penalty.'" *CVS Pharmacy*, 377 F. Supp. 3d at 375–76. Here, Exhibit B explicitly refers to the $500 and $1,000 amounts owed to Vonage by Venture as "penalt[ies]." *See* PX016 at Ex. B § 1. Furthermore, "[n]o evidence has been presented that suggests that the amount correlates with [Vonage's] anticipated actual damages." *CVS Pharmacy*, 377 F. Supp. 3d

at 376. Ms. Haniff's testimony on this issue was not especially helpful. She first stated that the penalty of was meant to compensate Vonage for the "cost to the company" of researching the calls, whereas if Vonage had the full sales recording it would be able to "tell right away . . . how to deal with the customer." Trial Tr. 91:22–92:11. But later, she testified that the penalty was not only for Vonage's "time and effort" but also for "reputational damage." *Id.* at 93:18–94:1. In her affidavit, she hits home on the reputational harm, stating that the $500 per missing call recording was Vonage's way of protecting its reputation by "insist[ing] in the CPA that Venture behave properly when selling Vonage services." Haniff Aff. ¶ 38.

To the extent that Haniff had any personal knowledge for the basis of the penalty, her assertion that it was in place, at least in part, to cause Venture to "behave properly" suggests the punitive nature of the provision as it was "intended to spark compliance with th[e] goals" of the CPA. *CVS Pharmacy*, 377 F. Supp. 3d at 376; *see also id.* (holding that a "payment obligation" which "serve[s] as a mere 'added spur to performance,' should not be enforced" (quoting *Priebe & Sons v. United States*, 332 U.S. 407, 413 (1947)).

That the "penalty payment . . . is automatically escalated in the event of repeated non-compliance" further supports the conclusion that Section 1 of Exhibit B is a penalty clause. *Id.* at 376–77. There is no evidence that the increase in penalty from $500 to $1,000 in any month where Venture had not turned over three requested recordings had any correlation to increased costs to Vonage. *See id.* at 377. Haniff testified that she did not know "why the penalty was increased just on the basis of the number of failed delivery attempts for the recordings" because she was "not involved in the negotiation" and had no "direct knowledge." Trial Tr. 276:21–277:12. Without any evidence of the need for such "increases in the penalty amount," the Court concludes that the

penalty structure was improperly punitive—in other words, "the kind of *in terrorem* spurs to performance that are emblematic of a penalty." *CVS Pharmacy*, 377 F. Supp. 3d at 377.

For these reasons, the Court denies Vonage's request for liquidated damages.

## IV. Lost Profits

Lastly, Vonage seeks damages for the long-term profits it would have gained but for Venture's breach of the contract. Venture responds that Vonage did not provide a reasonable estimate of its lost profits, and thus cannot recover these damages.

"Lost profits may be either general or consequential damages." *Biotronik A.G. v. Conor Medsystems Ir., Ltd.*, 22 N.Y.3d 799, 806 (N.Y. 2014). "General damages are those which are the natural and probable consequence of the breach . . . , while special damages are extraordinary in that they do not so directly flow from the breach." *Am. List Corp. v. U.S. News & World Rep., Inc.*, 75 N.Y.2d 38, 42–43 (N.Y. 1989). Although "[t]he distinction between general and specific damages is well defined[,] . . . its application to specific contracts and controversies is usually more elusive." *Id.* at 42. Where "the non-breaching party bargained for such profits and they are the direct and immediate fruits of the contract," a claim for lost profits is one for general damages. *Biotronik A.G.*, 22 N.Y.3d at 806. To prove lost profits as general damages, a party "must prove the fact of damages by a preponderance of the evidence." *Optima Media Grp. Ltd. v. Bloomberg L.P.*, No. 17-cv-1898, 2021 WL 1941878, at *18 (S.D.N.Y. May 14, 2021). "[O]nce the fact of damages has been established," the "plaintiff need only show a stable foundation for a reasonable estimate of the damage incurred as a result of the breach." *Id.*

On the other hand, where the damages "do not directly flow from the breach," they are consequential damages. *Biotronik, A.G.*, 22 N.Y.2d at 805. "In New York, a party is entitled to recover this form of lost profits only if (1) it is demonstrated with certainty that the damages have

been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties." *Tractebel*, 487 F.3d at 109. Thus, while "the proof required to show the *existence* of damages is the same for general and consequential damages," "[t]he standards differ . . . with respect to the calculation of the *amount* of damages." *Holland Loader Co. LLC v. FLSmidth A/S*, 769 F. App'x 40, 42–43 (2d Cir. 2019).

Because the CPA "does not specifically preclude recovery for lost profits, nor does it explicitly define lost profits as consequential damages," the Court must "turn to . . . precedent for guiding principles to assist in determining whether, under this agreement, . . . lost profits are general damages" or consequential damages. *Biotronik A.G.*, 22 N.Y.3d at 805. To do so, a court must look at the nature of the agreement, and determine "whether the lost profits flowed directly from the contract itself, or were, instead the result of a separate agreement with a nonparty." *Id.* at 808. The New York Court of Appeals has rejected "a bright-line rule" that lost profits can never constitute "general damages simply because they involve a third-party transaction." *Id.*; *see also Optima Media Grp.*, 2021 WL 1941878, at *20. To hold otherwise would "violate[] the case-specific approach . . . used to distinguish general damages from consequential damages." *Biotronik A.G.*, 22 N.Y.3d at 808. That the CPA provides for Vonage to pay commissions to Venture, and not the other way around, is of no consequence when determining whether lost profits are direct or consequential damages. *Id.* at 809 ("Whether lost profits are the natural and probable result of a breach does not turn on which party actually takes out the checkbook at the end of the fiscal quarter. Instead, [courts] look at the nature of the agreement.").

Although a close question, the Court finds that the lost profits sought by Vonage constitute general damages, as Vonage asserts. Even though the lost profits sought "are not specifically

identified in the" CPA, these "profits flow directly from" the commission structure. *Id.* at 808–09. Furthermore, the CPA's purpose was for Venture to "market, promote, sell and support . . . [Vonage] Services to Prospects and Customers under [Vonage's] Channel Partner Program," *see* PX011 at § 1.1, and in turn, Vonage would pay "a residual commission" "[f]or each customer [Venture] provide[d] . . . that [Vonage] accept[ed]," *see id.* § 3.1. *See also Biotronik A.G.*, 22 N.Y.3d at 808–09. That Vonage's profits depended on third parties—its customers—does not merit classifying lost profits as consequential damages because such profits were directly bargained for and were "the direct and immediate fruits of the contract." *Optima Media Grp.*, 2021 WL 1941878, at *20.

Because the lost profit damages Vonage seeks are general damages, it must both show that it suffered damages and set forth "a stable foundation for a reasonable estimate of the damage incurred as a result of the breach." *Id.* at *18. Vonage has met its burden of proving the former but not the latter. As a result of Venture's breach, it terminated the CPA. The termination of the CPA led Vonage to miss out on profits that it expected to gain via Venture's procurement of customers. As the Court held on summary judgment, Venture's sub-agents' use of misrepresentations to gain customers for Vonage, and its coverup of such misrepresentations, were in violation of the CPA. *See* ECF No. 237 at 11. That it was Vonage's decision to terminate the CPA does not absolve Venture of its liability for lost profits based on the terminated contact. *See Optima Media Grp.*, 2021 WL 1941878, at *20 (holding that "[b]ut for [the counterclaim defendant's] performance failures, [the counterclaim plaintiff] would not have terminated (as it would not have had the right to) and would have received" revenue from the parties' agreement). Vonage was not "require[d]" to "continue a broken contract with a failing partner." *Id.* Additionally, Venture's breach "directly and proximately" caused Vonage to "lose out on . . . future" revenue. *Id.* at *21.

Nor was Vonage's "termination" of the CPA "an intervening cause" that would "break the legal chain" between Venture's breach as the proximate cause of Vonage's lost profit damages. *Id.* ("To break the legal chain, the intervening act must have been of such an extraordinary nature or so attenuated from the defendant['s] conduct that responsibility for the injury should not reasonably be attributed to [it]"). "Far from being attenuated" from Venture's conduct, Vonage's "termination" of the CPA "was the direct and justified result" of Venture's breaches. *Id.* The CPA expressly contemplated that Vonage would terminate the agreement if Venture's sub-agents made false representations or fraudulent statements to customers. *See, e.g.*, PX011 at § 8.2.1 ("[Vonage] may terminate this Agreement . . . upon [Venture's] failure to cure within the 30 day cure period," if it has "intentionally or recklessly made any materially false representation, report or claim in connection with the sale of [Vonage] Services" or "[e]ngage[d] in any unlawful or fraudulent activity in connection with the sale of [Vonage] Services."); *see also id.* §§ 1.1, 2.2, 2.5, 2.8, 2.10.

Although Vonage has established it was damaged by Venture's breach of the CPA, it has not met its "burden to provide the Court with a reasonable means of and basis for calculating damages." *Optima Media Grp.*, 2021 WL 1941878, at *18. To "[e]stablish[] a 'stable foundation for a reasonable estimate,'" a plaintiff must "put[] forth a plausible theory that amounts to something more than a speculative measure of damages." *Cottam*, 2021 WL 1222120, at *5 (quoting *Freund*, 34 N.Y.2d at 383); *see also Freund*, 34 N.Y.2d at 384–85 (declining to grant a plaintiff more than nominal damages where, although the plaintiff was "prevented from realizing the gains promised by the contract—the royalties," "the amount of royalties plaintiff would have realized was not ascertainable with adequate certainty"). While financial projections can support a "plausible theory" of lost profits, a court "will not rely on" such projections "as a stable foundation for a reasonable estimate of general lost profits if they are not based on reliable data."

*Optima Media Grp.*, 2021 WL 1941878, at *22. The financial projections on which Vonage relied came from two main sources of evidence: (1) Ariel Collis' deposition testimony explaining his model and (2) Emily Haniff's testimony that Collis' model was easily extrapolated to calculate Vonage's lost profits. Both are speculative.

Collis was hired by Venture to create a model of Venture's own lost profits based on its claim for breach of contract against Vonage. Vonage seeks to use Collis' model in reverse to demonstrate its own lost profits based on Venture's breach of contract. Collis himself testified that his model could not be used to accurately predict the lost profits incurred by Vonage based on Venture's breach, because it contained assumptions that are not pertinent to Vonage's claims. When a counterclaim-plaintiff's "own expert testifie[s] that [financial] projections were unreliable," that counsels against finding it has reasonably estimated its lost profit damages. *See Optima Media Grp.*, 2021 WL 1941878, at *23. During trial, Collis stated numerous times that his model for calculating Venture's lost profits due to Vonage's wrongdoing could not be used to accurately calculate Vonage's lost profits due to Venture's wrongdoing. He repeatedly asserted that he never "offered an opinion on Vonage's alleged damages" or "dedicated the professional expert rigor [he] applied to [his] expert report on Venture's damages to offering a defensible opinion on damages Vonage claims to have suffered due to . . . breaches of the [CPA] by Venture." Trial Tr. 414:4–19. Instead, his opinions and models "relie[d] on the allegations [in Venture's] complaint" and "did not rely on . . . allegations of the Vonage counterclaims." *Id.* at 416:15–20; 418:9–12; *see also id.* at 401:10–13.[8]

Collis further testified that "if [he] were to create a model to show Vonage's lost revenue from customers who canceled due to misrepresentations," he "would not" have used the same

---

[8] Collis's deposition testimony states the same. *See, e.g.*, Collis Dep. Tr. 46:16–48:11, 206:16–207:8.

control group that he used to create a model for Venture's lost profits. *Id.* at 418:13–16; *see also id.* at 420:2–6. He confirmed that he never "convey[ed] to the Court or to Venture that if the complaint's allegations are not proven true, that the lost commissions calculations could be used to provide Vonage lost revenue based upon a breach of contract counterclaim" or that his "model can calculate lost profits based on the sub-agent misrepresentations that caused customers to believe they must switch to Vonage due to a merger or takeover of their current carrier." *Id.* at 427:6–16.

Collis opined that it was not "statistically plausible" that "the exact same percentage of lost commission revenue and imputed Vonage revenue would arise whether the cause was Vonage's breach of the contract as alleged in the complaint or alleged misrepresentation by subagents causing customers to switch to Vonage" based upon a misrepresentation. *Id.* at 422:11–21. That is because Collis's model accounted for a "large number of orders canceled" which is not consistent with the "few orders" of cancellations for misrepresentation depicted in "Ms. Haniff's prior testimony." *Id.* at 422:11–21. Vonage's argument that, because it accepted all of the assumptions in Collis' model, its extrapolation of its own lost profits from that model was accurate, misses the mark; Vonage did not provide evidence establishing it had a reasonable basis to accept the assumptions in Collis' model in the first place.

Haniff's testimony also does not convince the Court that Vonage reasonably estimated its lost profit damages. Haniff did not meaningfully explain why she relied on the inputs in Collis' model—which was created to project Venture's lost profits—to calculate Vonage's projections of its own lost profits. She cursorily explained that although Venture claims that Collis's "calculation of lost profits was based exclusively on the assumption that Vonage breached the CPA," that was "not, however, what Venture did in its analysis" because Venture and Collis "both admitted" that

they used as a control group a year in which "Venture's performance was, in Venture's own words, less impacted by Vonage's conduct." Haniff Aff. ¶ 57. Haniff does not state why, however, a control group "less impacted" by Vonage's breaches of the CPA (as alleged by Venture) would make it appropriate for use in determining Vonage's lost profits. Vonage did not cross-examine Collis to ask him this question itself, nor did it present any other witness to explain its lost profits theory.

Because Vonage failed to meet its burden of providing the Court with a reasonable estimate of the lost profit damages it incurred as a result of Venture's breach, it "may only recover nominal damages" for Venture's breach leading to its lost profits. *Optima Media Grp.*, 2021 WL 1941878, at *18. The Court thus awards Vonage nominal damages for lost profits.

## CONCLUSION

For the reasons stated above, the Court denies Vonage's request for liquidated damages. The Court awards Vonage $1 in nominal damages for commissions it paid to Venture and for lost profits.

SO ORDERED.

Dated:    October 16, 2024
          New York, New York

_____
Ronnie Abrams
United States District Judge

27